USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ Nos. 93-1618 93-2208 94-1506 UNITED STATES OF AMERICA, Appellee, v. STEPHEN A. SACCOCCIA, Defendant, Appellant. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ernest C. Torres, U.S. District Judge] ___________________ _________________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________ _________________________ Samuel Rosenthal, with whom Curtis, Mallet-Prevost, Colt & ________________ _______________________________ Mosle, Robert D. Luskin, and Comey Boyd & Luskin were on brief, _____ ________________ ___________________ for appellant. Nina Goodman, Attorney, Dep't of Justice, and Michael P. _____________ __________ Iannotti, Assistant United States Attorney, with whom Sheldon ________ _______ Whitehouse, United States Attorney, James H. Leavey, Assistant __________ ________________ United States Attorney, and Michael E. Davitt, Assistant United __________________ States Attorney, were on brief, for the United States. _________________________ June 28, 1995 _________________________ SELYA, Circuit Judge. A jury convicted defendant- SELYA, Circuit Judge. _____________ appellant Stephen A. Saccoccia on racketeering, money laundering, and related charges arising from his leadership of an organization that laundered well over $100,000,000 in drug money during the years 1986 through 1991. On appeal, Saccoccia challenges his extradition, the timing of his trial, his conviction, the forfeiture of certain assets, and the 660-year sentence that the district court imposed. Finding that his arguments do not wash, we affirm. I. BACKGROUND I. BACKGROUND We sketch the bareboned facts in the light most amiable to the government, see United States v. Ortiz, 966 F.2d 707, 710- ___ _____________ _____ 11 (1st Cir. 1992), cert. denied, 113 S. Ct. 1005 (1993), leaving _____ ______ much of the flesh and sinew for fuller articulation in connection with our discussion of particular issues. Appellant formerly controlled a network of precious metals businesses located in Rhode Island, New York, and California. He became enmeshed in money laundering through his involvement with a fellow metalman, Barry Slomovits. At a point in the mid-1980s, Slomovits was accepting millions of dollars in cash each week from Duvan Arboleda, who represented a group of Colombian drug lords (the Cali cartel). Slomovits used some of this cash to purchase gold from appellant. By special arrangement, the transactions were accomplished without documentation. In 1987, Arboleda and appellant agreed that they would 2 deal directly with each other. From that juncture forward, appellant used his various businesses to cleanse money funnelled to him by the Cali cartel and its emissaries (including Arboleda, Fernando Duenas, and Raoul Escobar). Typically, Arboleda would make large quantities of cash available to appellant; appellant would send some of it to Slomovits in New York; Slomovits would buy gold with the funds, resell the gold, and wire the proceeds to accounts that appellant controlled. Slomovits received apocryphal invoices from appellant's companies purporting to show sales of gold for sums corresponding to the amounts of the wire transfers. Ahron Sharir, a manufacturer of gold chain, also washed money for appellant. Appellant used Sharir's New York factory as a drop-off point for incoming shipments of currency, and Sharir laundered the cash by methods similar to those employed by Slomovits. The shipments to Sharir's factory continued until 1988. From then on, the two men forsook the New York factory, but continued to deal with each other. Appellant delivered cash totalling over $35,000,000 to Sharir at other locations between 1988 and 1990. By 1990, appellant's operations had expanded and had become largely independent of Slomovits. Appellant would bid for opportunities to launder money on behalf of the Cali cartel. When the cartel accepted a bid, he or his couriers would receive sacks of currency at prearranged delivery points. These shipments ordinarily ranged between $50,000 and $500,000 3 (although one delivery totalled $3,000,000). The bills were usually in small denominations. They would be counted, transported to one of appellant's offices in California or Rhode Island, then counted again, smurfed,1 and used to buy cashier's checks payable to one of appellant's companies. These purchases were made at various banks by underlings (e.g., David Izzi, ____ Anthony DeMarco, James Saccoccio, Kenneth Saccoccio) in accordance with instructions received from appellant or his wife, Donna Saccoccia. After the checks had been deposited in a company account, the money would then be wired to a foreign bank designated by Arboleda or Duenas. Along the way, appellant would deduct a commission that usually approximated ten percent of the laundered cash. This completed "la vuelta," the term used by the Cali cartel to describe a complete cycle of drug smuggling activities. The spring of 1991 marked the beginning of the end of appellant's career in high finance. During the early stages of his operation, the money received in New York was transported to Rhode Island by armored car and then deposited in an account standing in the name of a controlled corporation, Trend Precious Metals (Trend), at Citizens Bank. Between January 1, 1990 and  ____________________ 1The conspirators sought to avoid the currency transaction reporting requirements applicable to large cash transactions, see, e.g., 31 U.S.C. 5313 (1988); 31 C.F.R. 103.22(a)(1) ___ ____ (1994), by subdividing the cash into units of less than $10,000. The process of breaking down a large amount of cash into smaller, unreportable amounts a criminal act when done to avoid the reporting requirements, see 31 U.S.C.A. 5324 (West Supp. 1995) ___ is called "smurfing." 4 April 2, 1991, appellant and his wife wired over $136,000,000 out of the Trend account to an assortment of foreign banks. Citizens became suspicious and closed the account. In approximately the same time frame, an employee of an armored car service warned Richard Gizarelli, an unindicted coconspirator, that appellant was under investigation. Gizarelli promptly informed appellant. Notwithstanding these omens, appellant persisted. He did, however, alter his modus operandi. Instead of using private _____ ________ couriers to transport cash from New York to Rhode Island, he sent any of four men Izzi, Carlo DeMarco, Anthony DeMarco, or Vincent Hurley, often (but not always) operating in pairs to haul the money to Rhode Island. And, although appellant's cohorts continued to purchase bank checks from various Rhode Island financial institutions, appellant began to send the checks to his offices in California by air courier, often in canisters labeled as containing gold (to which appellant's henchmen added slag or scrap metal to increase weight). Accomplices used the money to purchase gold, which was then sold on the open market. The proceeds were eventually wired back to one of appellant's remaining Rhode Island accounts. In August of 1991, appellant convened a meeting at his mother's home. He showed the conferees (who included Donna Saccoccia, Izzi, and the two DeMarcos) a videotape that had been discovered accidentally in a nearby building. The tape reflected an ongoing surveillance of the back entrance to appellant's 5 Cranston coin shop. He advised his colleagues to start using the store's front entrance. Soon thereafter, appellant departed for Switzerland. In short order, the authorities indicted and extradited him. After unsuccessfully seeking to postpone prosecution on health-related grounds,2 appellant went to trial on November 4, 1992, in the United States District Court for the District of Rhode Island, along with several other indicted coconspirators (including his wife). Appellant's attorney became ill during trial, and the court declared a mistrial as to appellant.3 The new trial began on February 17, 1993, and resulted in his  ____________________ 2The district court held a hearing regarding appellant's professed ailments. Appellant had undergone a laminectomy at age 14 and had been hospitalized repeatedly during the next 20 years. He suffered a relapse while he was incarcerated in Switzerland, necessitating bed rest and medication. After being returned to the United States, appellant claimed to have reinjured his back. He also claimed that, on the eve of trial, a prison guard assaulted him, aggravating his condition. The court heard testimony from three physicians and concluded that "there [were] no objective findings by any doctor that would confirm the existence of any physical problem that would account for [appellant's current] complaints of pain." Accordingly, the court refused to grant a continuance. 3The first trial proceeded as to the other defendants. The jury returned its verdict on December 18, 1992, convicting Donna Saccoccia, Vincent Hurley, James Saccoccio, Kenneth Saccoccio, Stanley Cirella and Anthony DeMarco on the RICO conspiracy count, 18 U.S.C. 1962(d), and finding each of them guilty on certain other counts. Donna Saccoccia was convicted of 47 counts of money laundering under 18 U.S.C. 1957 and 13 counts of money laundering under 18 U.S.C. 1956(a)(2); Hurley was convicted of one count of structuring transactions to avoid currency reporting requirements, see 31 U.S.C. 5324(3), and one count of ___ interstate travel in aid of racketeering, see 18 U.S.C. 1952; ___ the two Saccoccios and Cirella were likewise convicted of structuring violations under 31 U.S.C. 5324(3); and Anthony DeMarco was convicted of filing false currency transaction reports in violation of 31 U.S.C. 5324(2). 6 conviction. These appeals followed. Saccoccia's appeals were consolidated for oral argument with the appeals arising out of the first trial. See supra note ___ _____ 3. Notwithstanding the obvious differences in the trial records and in the posture of the prosecutions for example, appellant was the leader of the money laundering organization; unlike most of the others, he was not tried for currency transaction reporting (CTR) offenses; and he was convicted in a trial separate from that of his codefendants appellant seeks to incorporate by reference eight arguments advanced by other defendants. Because appellant's position is not substantially similar to that of the codefendants, and because he has failed to develop the idiosyncracies of his own situation, we deem five of those arguments to have been abandoned.4 See United States v. ___ _____________ David, 940 F.2d 722, 737 (1st Cir. 1991) ("Adoption by reference, _____ however, cannot occur in a vacuum; to be meaningful, the arguments adopted must be readily transferrable from the proponent's case to the adopter's case."), cert. denied, 504 U.S. _____ ______ 955 (1992).  ____________________ 4The five waived asseverations comprise: (1) whether the CTR charges, and the evidence engendered thereby, violated the Fifth Amendment privilege against self-incrimination; (2) whether the district court's jury instructions overlooked the teachings of Reves v. Ernst & Young, 113 S. Ct. 1163 (1993); (3) whether _____ _____________ the court erred in instructing the jury that coconspirators' knowledge could be established by evidence of willful blindness; (4) whether the court erred in determining the scope of the charged conspiracy; and (5) whether the value of the washed funds as calculated for sentencing purposes improperly included revenue that the government conceded was legitimate in origin. In all events, none of these contentions appears to have much bite. 7 Nevertheless, we are left with no shortage of food for thought. Appellant has served up a bouillabaisse of other offerings. We address his meatier propositions below, including the three "incorporated" contentions that arguably have been preserved. And although we do not deem detailed discussion desirable, the record should reflect that we have masticated appellant's remaining points and found them indigestible. II. EXTRADITION II. EXTRADITION As a threshold matter, appellant maintains that his trial and ensuing conviction violated the extradition treaty between the United States and Switzerland, and, in the bargain, transgressed the principles of dual criminality and specialty. We reject these importunings. A. Gaining Perspective. A. Gaining Perspective. ___________________ Further facts are needed to place appellant's extradition-related claims into a workable perspective. On November 18, 1991, a federal grand jury returned the indictment that inaugurated this prosecution. Count 1 charged appellant, his wife, and eleven associates with RICO conspiracy. See 18 ___ U.S.C. 1962(d) (1988). A RICO conspiracy, of course, requires the government to prove, inter alia, an illicit agreement to _____ ____ conduct a pattern of racketeering activity. See United States v. ___ _____________ Ruiz, 905 F.2d 499, 503 (1st Cir. 1990); see also 18 U.S.C.  ____ ___ ____ 1962(c) (1988). Proof of a pattern demands that the prosecution show "at least two acts of racketeering activity." 18 U.S.C.  1961(5) (1988). These acts, which must themselves comprise 8 violations of specified criminal statutes, see id. 1961(1)(B), ___ ___ are commonly referred to as "predicates" or "predicate acts." See, e.g., Ruiz, 905 F.2d at 503. ___ ____ ____ In the instant indictment, the alleged racketeering activity comprised, among other specified predicate acts, incidents of money laundering, see 18 U.S.C. 1956, 1957, CTR ___ violations, see 31 U.S.C. 5324(1)-(3), and using travel and ___ facilities in interstate commerce to promote these money laundering ventures, see 18 U.S.C. 1952(a)(3). The grand jury ___ also averred that the RICO conspiracy had been accomplished by means that included failing to file the necessary CTRs for cash transactions over $10,000. Counts 2-53 of the indictment charged appellant and others with failing to file CTRs in specific instances, see 31 U.S.C. 5324(1); counts 54-68 charged ___ appellant with illegally structuring monetary transactions in order to avoid the CTR reporting requirements, see id. 5324(3); ___ ___ counts 69-129 charged appellant and his wife with the use of property derived from unlawful activities while engaging in monetary transactions affecting interstate commerce, see 18 ___ U.S.C. 1956; counts 130-142 charged appellant and his wife with money laundering in violation of 18 U.S.C. 1956(a)(2); and counts 143-150 charged appellant and others with Travel Act violations under 18 U.S.C. 1952(a)(3). The indictment also contained forfeiture allegations under the applicable RICO and money laundering statutes. See 18 U.S.C. 982, 1963. ___ Six days after the grand jury returned the indictment, 9 Swiss authorities arrested the Saccoccias in Geneva. They contested extradition on counts 1 through 68, and counts 143 through 150. On June 11, 1992, the Swiss Federal Tribunal (SFT) granted extradition on all charges except those contained in counts 2 through 68. The SFT reasoned that these 67 counts constituted nonextraditable offenses because Swiss law did not prohibit the underlying conduct. The SFT's discussion did not specifically mention the forfeiture allegations. The Swiss surrendered appellant to the United States. He was transported to Rhode Island and arraigned on July 15. One week later, the grand jury returned a superseding indictment.5 On July 30, the Justice Department, in the person of Michael O'Hare, wrote to Tania Cavassini, a Swiss official, enclosing a copy of the superseding indictment and inquiring whether it required a waiver of the rule of specialty. On December 1, 1992, apparently in response to an inquiry from Cavassini, O'Hare transmitted a written assurance that, although the court papers still formally listed appellant  ____________________ 5The charges laid against appellant in the superseding indictment closely paralleled those contained in the original bill. Specifically, the grand jury accused appellant of RICO conspiracy (count 1), failure to file CTRs (counts 2-9), filing false CTRs (counts 10-22), unlawfully structuring monetary transactions to evade filing requirements (counts 23-37), engaging in monetary transactions using property derived from illegal activities (counts 38-98), money laundering (counts 121- 33), and interstate travel in aid of racketeering (counts 134- 41). Like the original indictment, the superseding indictment alleged violations of CTR requirements as predicate offenses for the RICO conspiracy and Travel Act counts, and reiterated the forfeiture allegations. However, the superseding indictment did include several counts not directed at appellant (counts 99-120). 10 as a defendant in respect to the CTR counts (for which extradition had been denied), the prosecution did not intend to press those counts. O'Hare explained that the prosecutor would offer no evidence of appellant's guilt on those charges, with the result that "American law [will require] the judge to direct the jury to find the defendant not guilty." The following day, Cavassini advised that, under a "final decision" dated November 20, 1992, the SFT had "granted extradition of [appellant] for the facts enclosed in the Count Nr. 1 of the Superseding Indictment." Cavassini also indicated that appellant's local counsel in Geneva agreed with the SFT's decision and had scotched any possibility of a further appeal. On February 2, 1993, before the start of the trial with which we are concerned, the government moved to dismiss those counts of the superseding indictment (counts 2-37) that charged appellant with CTR offenses. The district court complied. The matter resurfaced in a slightly different shape ten days later when appellant's Swiss lawyer, Paul Gully-Hart, wrote to Cavassini expressing concern that appellant's impending prosecution on charges in which CTR violations were embedded as predicates for other offenses would insult the rule of specialty. On March 2, Gully-Hart wrote again, this time enclosing a copy of the prosecution's opening statement to the petit jury. Cavassini forwarded both of these letters to O'Hare. On March 8, Cavassini spoke with O'Hare and voiced her concern that appellant might be convicted under count 1 solely on the basis of CTR offenses. 11 The next day, Assistant United States Attorney James Leavey, a member of the prosecution team, advised Judge Torres that he had spoken with O'Hare. Without conceding the legal validity of Gully-Hart's point, Leavey asked the court to instruct the jury that CTR violations could not serve as predicates for purposes of either the RICO or Travel Act counts. When the court acquiesced, the government submitted a redacted indictment that deleted all references to CTR offenses from the RICO and Travel Act counts. Appellant nonetheless moved for a mistrial, invoking the rules of dual criminality and specialty. The district court denied the motion, explaining that it had agreed to the government's proposal purely as an accommodation. In the judge's view, the precautions were not legally required because the SFT had been pellucid in authorizing prosecution on the RICO count even though the claimed CTR violations were prominently displayed therein as potential predicates. The judge noted, moreover, that evidence of appellant's CTR violations was in all events admissible in connection with the substantive money laundering counts (as to which extradition had been approved). Appellant resurrected the issue in his motion for a new trial following the adverse jury verdict. The court stood firm. B. Dual Criminality and Specialty. B. Dual Criminality and Specialty. ______________________________ Although the principles of dual criminality and specialty are closely allied, they are not coterminous. We elaborate below. 12 1. Dual Criminality. The principle of dual 1. Dual Criminality. _________________ criminality dictates that, as a general rule, an extraditable offense must be a serious crime (rather than a mere peccadillo) punishable under the criminal laws of both the surrendering and the requesting state. See Brauch v. Raiche, 618 F.2d 843, 847 ___ ______ ______ (1st Cir. 1980). The current extradition treaty between the United States and Switzerland embodies this concept. See Treaty ___ of Extradition, May 14, 1900, U.S.-Switz., Art. II, 31 Stat. 1928, 1929-30 (Treaty). The principle of dual criminality does not demand that the laws of the surrendering and requesting states be carbon copies of one another. Thus, dual criminality will not be defeated by differences in the instrumentalities or in the stated purposes of the two nations' laws. See Peters v. Egnor, 888 F.2d ___ ______ _____ 713, 719 (10th Cir. 1989). By the same token, the counterpart crimes need not have identical elements. See Matter of ___ __________ Extradition of Russell, 789 F.2d 801, 803 (9th Cir. 1986). ________________________ Instead, dual criminality is deemed to be satisfied when the two countries' laws are substantially analogous. See Peters, 888 ___ ______ F.2d at 719; Brauch, 618 F.2d at 851. Moreover, in mulling dual ______ criminality concerns, courts are duty bound to defer to a surrendering sovereign's reasonable determination that the offense in question is extraditable. See Casey v. Department of ___ _____ _____________ State, 980 F.2d 1472, 1477 (D.C. Cir. 1992) (observing that an _____ American court must give great deference to a foreign court's determination in extradition proceedings); United States v. Van ______________ ___ 13 Cauwenberghe, 827 F.2d 424, 429 (9th Cir. 1987) (similar), cert. ____________ _____ denied, 484 U.S. 1042 (1988). ______ Mechanically, then, the inquiry into dual criminality requires courts to compare the law of the surrendering state that purports to criminalize the charged conduct with the law of the requesting state that purports to accomplish the same result. If the same conduct is subject to criminal sanctions in both jurisdictions, no more is exigible. See United States v. Levy, ___ _____________ ____ 905 F.2d 326, 328 (10th Cir. 1990), cert. denied, 498 U.S. 1049 _____ ______ (1991); see also Collins v. Loisel, 259 U.S. 309, 312 (1922) ("It ___ ____ _______ ______ is enough [to satisfy the requirement of dual criminality] if the particular act charged is criminal in both jurisdictions."). 2. Specialty. The principle of specialty a 2. Specialty. _________ corollary to the principle of dual criminality, see United States ___ _____________ v. Herbage, 850 F.2d 1463, 1465 (11th Cir. 1988), cert. denied, _______ _____ ______ 489 U.S. 1027 (1989) generally requires that an extradited defendant be tried for the crimes on which extradition has been granted, and none other. See Van Cauwenberghe, 827 F.2d at 428; ___ ________________ Quinn v. Robinson, 783 F.2d 776, 783 (9th Cir.), cert. denied, _____ ________ _____ ______ 479 U.S. 882 (1986). The extradition treaty in force between the United States and Switzerland embodies this concept, providing that an individual may not be "prosecuted or punished for any offense committed before the demand for extradition, other than that for which the extradition is granted . . . ." Treaty, Art. IX. Enforcement of the principle of specialty is founded 14 primarily on international comity. See United States v. Thirion, ___ _____________ _______ 813 F.2d 146, 151 (8th Cir. 1987). The requesting state must "live up to whatever promises it made in order to obtain extradition" because preservation of the institution of extradition requires the continuing cooperation of the surrendering state. United States v. Najohn, 785 F.2d 1420, 1422 _____________ ______ (9th Cir.) (per curiam), cert. denied, 479 U.S. 1009 (1986). _____ ______ Since the doctrine is grounded in international comity rather than in some right of the defendant, the principle of specialty may be waived by the asylum state. See id. ___ ___ Specialty, like dual criminality, is not a hidebound dogma, but must be applied in a practical, commonsense fashion. Thus, obeisance to the principle of specialty does not require that a defendant be prosecuted only under the precise indictment that prompted his extradition, see United States v. Andonian, 29 ___ _____________ ________ F.3d 1432, 1435-36 (9th Cir. 1994), cert. denied, 115 S. Ct. 938 _____ ______ (1995), or that the prosecution always be limited to specific offenses enumerated in the surrendering state's extradition order, see Levy, 905 F.2d at 329 (concluding that a Hong Kong ___ ____ court intended to extradite defendant to face a continuing criminal enterprise charge despite the court's failure specifically to mention that charge in the deportation order). In the same vein, the principle of specialty does not impose any limitation on the particulars of the charges lodged by the requesting nation, nor does it demand departure from the forum's existing rules of practice (such as rules of pleading, evidence, 15 or procedure). See United States v. Alvarez-Moreno, 874 F.2d ___ _____________ ______________ 1402, 1414 (11th Cir. 1989), cert. denied, 494 U.S. 1032 (1990); _____ ______ Thirion, 813 F.2d at 153; Demjanjuk v. Petrovsky, 776 F.2d 571, _______ _________ _________ 583 (6th Cir. 1985), cert. denied, 475 U.S. 1016 (1986). _____ ______ In the last analysis, then, the inquiry into specialty boils down to whether, under the totality of the circumstances, the court in the requesting state reasonably believes that prosecuting the defendant on particular charges contradicts the surrendering state's manifested intentions, or, phrased another way, whether the surrendering state would deem the conduct for which the requesting state actually prosecutes the defendant as interconnected with (as opposed to independent from) the acts for which he was extradited. See Andonian, 29 F.3d at 1435; United ___ ________ ______ States v. Cuevas, 847 F.2d 1417, 1427-28 (9th Cir. 1988), cert. ______ ______ _____ denied, 489 U.S. 1012 (1989); United States v. Paroutian, 299 ______ _____________ _________ F.2d 486, 490-91 (2d Cir. 1962). C. Applying the Principles. C. Applying the Principles. _______________________ A district court's interpretation of the principles of dual criminality and specialty traditionally involves a question of law and is, therefore, subject to plenary review in the court of appeals. See Andonian, 29 F.3d at 1434; United States v. ___ ________ ______________ Khan, 993 F.2d 1368, 1372 (9th Cir. 1993); United States v. ____ ______________ Abello-Silva, 948 F.2d 1168, 1173 (10th Cir. 1991), cert. denied, ____________ _____ ______ 113 S. Ct. 107 (1992). Marching beneath this banner, appellant 16 urges that his conviction must be set aside for three related reasons.6 None has merit. 1. Predicate Acts. Appellant's flagship contention 1. Predicate Acts. _______________ rests on the postulate that an offense which is itself nonextraditable cannot serve as a predicate act in connection with other, extraditable offenses; and that, therefore, the government's use of nonextraditable CTR offenses as predicate acts for purposes of the RICO and Travel Act counts crossed the line into forbidden territory. Even if we assume, however, that in some situations reliance on nonextraditable offenses as predicates for other, extraditable offenses might run afoul of dual criminality or specialty principles, the circumstances of this case present no such problem.  ____________________ 6There is some dispute whether alleged violations of the principle of specialty can be raised by a criminal defendant. See, e.g., Demjanjuk, 776 F.2d at 583-84 (questioning whether the ___ ____ _________ person being extradited "has standing to assert the principle of specialty"); Kaiser v. Rutherford, 827 F. Supp. 832, 835 (D.D.C. ______ __________ 1993) (asserting that "[t]he rule of specialty is not a right of the accused but is a privilege of the asylum state and therefore [the defendant] has no standing to raise this issue") (internal quotation marks omitted). We need not probe the matter of standing for three reasons. First, while we take no view of the issue, we realize that there are two sides to the story, and the side that favors individual standing has much to commend it. See, e.g., United States v. Rauscher, 119 U.S. 407, 422-24 (1886) ___ ____ _____________ ________ (referring to specialty as a "right conferred upon persons brought from a foreign country" via extradition proceedings); Thirion, 813 F.2d at 151 & n.5 (to like effect); see also United _______ ___ ____ ______ States v. Alvarez-Machain, 504 U.S. 655, 659-60 (1992) ______ _______________ (suggesting the continuing vitality of the Rauscher decision). ________ Second, the government has advised us that, for policy reasons, it does not challenge appellant's standing in this instance. Third, appellant's asseverations are more easily dismissed on the merits. See Norton v. Mathews, 427 U.S. 524, 532 (1976) ___ ______ _______ (explaining that jurisdictional questions may be bypassed when a ruling on the merits will achieve the same result). 17 In general, we do not believe that there can be a violation of the principle of specialty where the requesting nation prosecutes the returned fugitive for the exact crimes on which the surrendering nation granted extradition. So it is here: the SFT twice approved appellant's extradition on counts that prominently featured CTR offenses as predicates. This approval to which we must pay the substantial deference that is due to a surrendering court's resolution of questions pertaining to extraditability, see, e.g., Casey, 980 F.2d at 1477 strongly ___ ____ _____ suggests that the RICO and Travel Act counts, despite their mention of predicates which, standing alone, would not support extradition, are compatible with the criminal laws of both jurisdictions. Though a Swiss official may informally have fretted about the prospect of a RICO or Travel Act conviction based on nonextraditable predicates, we are reluctant to conclude on this gossamer showing that the SFT did not know and appreciate the clearly expressed contents of the indictment when it sanctioned extradition. To clinch matters, the prosecution avoided any potential intrusion on the principles of either dual criminality or specialty by taking a series of prophylactic actions at trial. The fourth redacted indictment removed all references to CTR offenses from the compendium of charges pressed against the appellant. The judge then reinforced this fumigation of the indictment by advising the jurors that they should not concern 18 themselves with whether appellant had committed any CTR offenses.7 These precautions purged any taint, and knocked the legs out from under the line of reasoning that appellant seeks to pursue. 2. Keeping Faith. Next, appellant asserts that the 2. Keeping Faith. _____________ government infringed on the principle of specialty by breaking its promise to the Swiss government and introducing evidence of CTR violations at appellant's trial. Abstractly, we agree with the core element of appellant's premise: the principle of specialty requires the requesting state to abide by the promises it makes to the surrendering state in the process of procuring extradition. See Najohn, 785 F.2d at 1422. But, concretely, we ___ ______ are unable to discern any breach of faith in this instance. Thus, we resist the conclusion that appellant would foist upon us.  ____________________ 7The judge instructed the jury: You have heard references during this trial to currency transaction reporting requirements and I should make it clear that you are not being called upon to determine whether the defendant violated or conspired to violate any of those requirements. Therefore, you may consider evidence regarding the nature of currency transactions with banks to the extent that such evidence, in your view, may bear on the source of the money involved and/or the purposes for which the money may have been transferred or transported. But in reaching your verdict, you may not consider whether any such transactions were or were not consistent with transaction reporting requirements because, . . . as I have just said, that is not an issue in this case. . . . 19 To buttress the claim that the United States did not keep its word, appellant avers that O'Hare's facsimile transmission, sent on December 1, 1992, was the functional equivalent of an assurance that the prosecutor would not present any evidence to the jury regarding Saccoccia's noncompliance with CTR requirements. Fairly read, the document despite its iteration that the prosecutor "would present no evidence regarding [Saccoccia's] guilt . . . on the charges for which extradition was not granted" does not support appellant's construction. O'Hare sent the transmittal in response to Cavassini's expression of concern that appellant might be convicted of charges for which extradition had been denied. His reply, taken in context, see supra pp. 10-11, amounted to no more ___ _____ than an assurance against that possibility. To read a promise _________________________ not to introduce any evidence relevant to CTR violations into O'Hare's statement would necessitate wresting it from its contextual moorings and unreasonably stretching its literal meaning. We decline appellant's invitation to indulge in such phantasmagoric wordplay.8 3. The Claimed "Prosecution." Appellant's third 3. The Claimed "Prosecution." ____________________________ contention is that the government violated the principle of  ____________________ 8Of course, appellant had already been extradited and the Swiss authorities had already approved the superseding indictment before this supposed promise was made. This places a further obstacle in appellant's path: it strikes us as problematic whether the breach of a promise made after the defendant has been _____ extradited, without more, furnishes a basis for reversing an ensuing conviction. In such circumstances, the surrendering state, by definition, has not relied on the requesting state's promise in deciding to return the defendant. 20 specialty because it prosecuted him for CTR offenses. Since the nonextraditable CTR counts, as they pertained to appellant, were dismissed before the second trial began, his claim is founded on no more than the fact that his name appeared on the indictment during the first trial. While this may literally be "prosecution," it is prosecution in name only and we will not carry hollow formalism to a point at which it engulfs common sense. Consequently, we hold that the mere existence of an unredacted indictment, under the circumstances of this case, is no reason to invalidate Saccoccia's conviction. Cf. Tacket v. ___ ______ Delco Remy Div. of Gen. Motors Corp., 937 F.2d 1201, 1202 (7th _____________________________________ Cir. 1991) (Bauer, C.J.) (quoting doggerel to the effect that "[s]ticks and stones may break your bones, but names can never hurt you"). This leaves appellant's argument that he was illegally "prosecuted" because CTR offenses were included as predicate acts for purposes of the RICO and Travel Act counts until the fourth redacted indictment surfaced. As we have already observed, however, it would have been perfectly proper for the government to seek convictions on those counts based on CTR predicates. Hence, appellant's argument is without merit.9 For these reasons, we find appellant's conviction free from taint under the applicable extradition laws.  ____________________ 9If more is needed and we do not believe that it is the evidence of CTR violations, by and large, was independently admissible to support various aspects of the money laundering charges and other substantive counts for which extradition was explicitly approved. 21 III. THE COVETED CONTINUANCE III. THE COVETED CONTINUANCE Appellant contends that the district court arbitrarily refused him a lengthy continuance prior to the start of the second trial,10 leaving him with insufficient preparation time. Our analysis of the record indicates that the court acted within its discretion in scotching appellant's request. A. Setting the Stage. A. Setting the Stage. _________________ At arraignment, two attorneys, Jack Hill and Brian Adae, entered appearances as appellant's counsel. Soon thereafter, Austrian authorities arrested Hill for money laundering. Hill languished in prison from August through November of 1992. During that interval, he could not communicate with, or effectively assist, Saccoccia. Adae, who had originally been enlisted as local counsel, stepped into the breach and acted as lead counsel. Shortly after the first trial began, Adae became ill. The court granted appellant's motion for a mistrial and ordered a severance. The case proceeded to verdict vis-a-vis the other defendants. See supra note 3. ___ _____ Naturally, the severance required a separate trial for appellant. The district court proposed to start in early February of 1993. Within a matter of days after the court announced the schedule, Hill, recently released from an Austrian prison, and Kenneth O'Donnell, a prominent Rhode Island defense lawyer, entered appearances as appellant's counsel. On December  ____________________ 10Appellant does not assign error to the denial of the continuances that he sought before the first (aborted) trial. See supra note 2. ___ _____ 22 10, 1992, appellant signed an extensive waiver of the potential conflict of interest posed by Hill's representation of him at a time when Hill himself faced charges of money laundering arising out of activities undertaken in conjunction with appellant. On the same day, the court held a hearing anent the waiver. Among other things, appellant requested that his trial be rescheduled to April of 1993 so that his defense team could have more time to prepare. He claimed this extra time was necessary to review financial documents, study surveillance tapes, glean exculpatory evidence, and analyze inconsistencies in the statements of government witnesses. The court granted only a two-week extension, from February 3 to February 17, noting that the original indictment had been returned in 1991 and that counsel already had enjoyed a considerable period for preparation. Subsequent requests for continuances were also denied. B. Applicable Legal Principles. B. Applicable Legal Principles. ___________________________ Trial management is peculiarly within the ken of the district court.11 That court has great latitude in managing  ____________________ 11As we wrote on an earlier occasion: There is an important public interest in the efficient operation of the judicial system and in the orderly management of crowded dockets. . . . The district judge is at the helm, sensitive to the tides that ebb and flow during a prolonged trial and knowledgeable about systemic demands. He is, therefore, the person best equipped to balance the competing considerations. United States v. Devin, 918 F.2d 280, 291 (1st Cir. 1990). _____________ _____ 23 its docket, including broad discretion to grant or withhold continuances. Only "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" constitutes an abuse of that discretion. Morris v. Slappy, 461 ______ ______ U.S. 1, 11-12 (1983) (internal quotation marks omitted); see also ___ ____ United States v. Devin, 918 F.2d 280, 291 (1st Cir. 1990) ______________ _____ (explaining that an appellate court "must show great deference" to district court decisions of this nature, and should overturn such decisions "only for a manifest abuse of discretion"). For present purposes, this means that the decision below must endure unless the party who moved for the continuance can demonstrate that, in withholding relief, the trial court indulged a serious error of law or suffered a meaningful lapse of judgment, resulting in substantial prejudice to the movant.12 See, e.g., ___ ____ United States v. Saget, 991 F.2d 702, 708 (11th Cir.), cert. ______________ _____ _____ denied, 114 S. Ct. 396 (1993); United States v. Dennis, 843 F.2d ______ _____________ ______ 652, 653 n.1 (2d Cir. 1988). For the purpose of determining whether a denial of a continuance constitutes an abuse of discretion, each case is sui ___ generis. See United States v. Torres, 793 F.2d 436, 440 (1st _______ ___ _____________ ______  ____________________ 12The Seventh Circuit has gone so far as to term trial court decisions denying continuances "virtually unreviewable." United ______ States v. Stevenson, 6 F.3d 1262, 1265 (7th Cir. 1993) (internal ______ _________ quotation marks omitted). We think this description heads in the right direction but goes too far. See, e.g., United States v. ___ ____ _____________ Soldevila-Lopez, 17 F.3d 480, 490 (1st Cir. 1994) (reversing _______________ district court's refusal to grant a continuance on the ground that newly emergent evidence justified more time); Delaney v. _______ United States, 199 F.2d 107, 115 (1st Cir. 1952) (finding that ______________ nationwide publicity had created a hostile atmosphere, and that, therefore, the district court should have granted a continuance). 24 Cir.), cert. denied, 479 U.S. 889 (1986). A reviewing court must _____ ______ look first at the reasons contemporaneously presented in support of the request for the continuance. See United States v. ___ _____________ Lussier, 929 F.2d 25, 28 (1st Cir. 1991). Other relevant factors _______ may include such things as the amount of time needed for effective preparation, the amount of time actually available for preparation, the amount of time previously available for preparation and how assiduously the movant used that time, the extent to which the movant has contributed to his perceived predicament, the complexity of the case, the availability of assistance from other sources, the probable utility of a continuance, the extent of inconvenience to others (such as the court, the witnesses, and the opposing party) should a continuance ensue, and the likelihood of injustice or unfair prejudice attributable to the denial of a continuance. See ___ United States v. Soldevila-Lopez, 17 F.3d 480, 488 (1st Cir. ______________ _______________ 1994); Lussier, 929 F.2d at 28; United States v. Zannino, 895 _______ _____________ _______ F.2d 1, 13-14 (1st Cir.), cert. denied, 494 U.S. 1082 (1990). _____ ______ C. Analysis. C. Analysis. ________ Here, balancing the relevant considerations leaves us confident that the circumstances justified the refusal to grant a continuance. And, moreover, the record belies appellant's contention that the court's obduracy unfairly prejudiced his rights by leaving him insufficient time to prepare for trial. Appellant's most loudly bruited point is that the government produced 1600 hours of wiretap audio tapes, and that he had only 25 67 days, which he translates as equalling 1608 hours, to listen to them. Although this lament has some superficial plausibility, we agree with the district court that, notwithstanding the number of tapes, it was reasonable to expect defense counsel to be ready for trial in February. We explain briefly. The grand jury indicted appellant in November of 1991. Thus, appellant's counsel, collectively, had far more than 67 days in which to work on the case. Moreover, the lawyers had the not-inconsiderable benefit of a dress rehearsal, including unlimited access to the full record of the first trial (in which virtually the entire case against appellant was aired). O'Donnell, one of appellant's new attorneys, was especially familiar with the situation because he had represented a codefendant who had been acquitted in a separate trial. Furthermore, Hill and O'Donnell could and no doubt did confer with counsel for the codefendants and with Attorney Adae. In short, the means for efficacious preparation were tidily at hand. Appellant's other assertions of supposed prejudice also lack force. For example, his suggestion that a continuance might have enabled him to receive a complete transcript of Agent Shedd's conversation with Duenas overlooks the fact that the government provided him with the entire transcript. See infra ___ _____ Part IV (E). His claim that more time was needed to obtain a copy of a DEA report that he asserts would have bolstered the testimony of an expert witness overlooks the fact that the expert knew of the report and described its conclusions. See infra note ___ _____ 26 18. His claim that a continuance would have enabled him to obtain enhanced versions of two of the surveillance tapes before trial, see infra Part IV (F), is completely unpersuasive given ___ _____ his assertion that the enhanced tapes, when received, were "unclear" and "unintelligible." Appellant's Brief at 36. And, finally, appellant's exhortation that a continuance would have allowed him to investigate whether the laundered cash represented gambling proceeds, as opposed to drug money, is unaccompanied by any colorable basis for assuming that his supposition was anything more than the most remote of possibilities. In a nutshell, appellant has not made a sufficient showing of undue prejudice to warrant us in second-guessing either the district court's resolve to start the trial in mid- February of 1993 or its decision to grant appellant a far more modest delay than he requested. Since the record reflects no pressing need for an extended continuance, and likewise fails to demonstrate significant harm flowing from the lack of one, the denial of the motion for a continuance cannot be said to have substantially impaired appellant's defense. See, e.g., Dennis, ___ ____ ______ 843 F.2d at 653 n.1. Thus, no cognizable error inheres. D. Conflict of Interest. D. Conflict of Interest. ____________________ Relatedly, appellant claims that the denial of a continuance saddled him with conflict-ridden counsel. This construct does not withstand scrutiny. To show an actual conflict of interest, a criminal defendant "must demonstrate that some plausible alternative defense strategy might have been 27 pursued" and "that this alternative strategy was not pursued because of the attorney's other loyalties or interests." United ______ States v. Garcia-Rosa, 876 F.2d 209, 231 (1st Cir. 1989), cert. ______ ___________ _____ granted and judgment vacated on other grounds, 498 U.S. 954 _________________________________________________ (1990). Appellant cannot meet this standard. Appellant sees the conflict of interest as centered in Hill's need to protect himself at his client's expense. Appellant supports this accusation by repeated reference to Hill's indictment in Austria on charges that he conspired with appellant to launder the fruits of unlawful activity but appellant does not suggest any way in which this alleged conflict of interest adversely affected Hill's representation of him at trial. What is more, appellant's claim that he was faced with an intolerable dilemma he could accept Hill as his counsel or proceed to trial with an attorney who was untutored in the case  is flatly contradicted by the record. Appellant insisted, time and again, despite the district court's painstaking explanation of his right to conflict-free counsel, that Hill was the advocate of his choosing. Appellant told the court unequivocally that he understood the potential conflict, but desired Hill's services. And he adhered to his position notwithstanding the court's entreaty to reconsider and its advice that he would be "better off" with an attorney free of any ties to the situation. Last but surely not least appellant executed a written waiver stating that, after "[h]aving been fully advised 28 of the possible adverse consequences arising from the actual or potential conflicts with which Hill is or may be encumbered," he "knowingly, voluntarily, intelligently, and irrevocably [wishes] to waive any and all such actual or potential conflicts of interest for the purpose of retaining Hill as his counsel." When a defendant knowingly selects a course of action, fully cognizant of its perils, he cannot later repudiate it simply because his case curdles. In the circumstances at bar, it is neither unfair nor unjust to hold appellant to his words. Thus, the district court's determination that appellant had voluntarily and knowingly waived his right to conflict-free representation is unimpugnable. See Holloway v. Arkansas, 435 U.S. 475, 483 n.5 ___ ________ ________ (1978) (stating that "a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests"). Appellant has another arrow in this quiver. He reasons that the court should have overlooked his waiver of conflict-free counsel because Hill's continued representation constituted an unwaivable constitutional transgression. To be sure, a few courts have found a per se Sixth Amendment violation "where trial counsel was implicated in the crime for which his client was on trial." Soldevila-Lopez, 17 F.3d at 487 n.4 (citing cases). But _______________ these cases tend to involve circumstances in which an attorney has reason to fear that a vigorous defense of the client might unearth proof of the attorney's criminality. See, e.g., United ___ ____ ______ States v. Cancilla, 725 F.2d 867, 870 (2d Cir. 1984). Although ______ ________ 29 Hill informed the court, in the vaguest of generalities, that he feared being charged or called as a witness in appellant's case, he provided no substantiation of these assertions, nor was he able to explain how the hypothetical conflict would, at that time, affect his representation of the appellant. Therefore, the district court seems entirely justified in concluding that Hill's representation of appellant would not be hampered by a realistic foreboding that vigorous advocacy would uncover evidence of his own crimes. Cf. William Shakespeare, Macbeth, Act I, sc. iii, ___ _______ ll. 133-34 (1605) (noting that "present fears are less than horrible imaginings"). The sockdolager is that, wholly apart from Hill's status, appellant was also represented at trial by another lawyer, O'Donnell, who had no conflict of interest.13 In an effort to scale this rampart, appellant suggests that O'Donnell, too, had an actual conflict of interest arising out of his previous representation of a codefendant, Raymond Marotto. By December of 1992, however, Marotto, a bank employee charged with failing to file CTRs, had been acquitted in a separate trial. Appellant's convoluted explanation of how O'Donnell's concluded representation of Marotto created a conflict of interest is difficult to follow. He seems to be saying, without any citation  ____________________ 13At the December 10, 1992 waiver hearing, O'Donnell told the court that he had been "independently retained by [appellant] to be local counsel and co-counsel." He assured the court that he would "independently advise [appellant] with respect to any matters that might be affected by any potential conflict of interest Mr. Hill might have." 30 to the record, that Marotto (who was not called to testify at appellant's trial) could have been a material witness. We reject this unfounded speculation. As O'Donnell himself pointed out, Marotto's case turned on whether he did or did not have a responsibility to file CTRs. There is nothing in the record that suggests that Marotto had any knowledge that might have been useful in appellant's defense. We have routinely dismissed analogous conflict of interest claims, see, e.g., Garcia-Rosa, 876 F.2d at 231 (so ___ ____ ___________ holding when defendant "provide[d] no substantiation" for his assertion that his counsel had a conflict of interest that manifested itself when he did not call as a witness a person whom he previously had represented), and we dismiss appellant's claim on the same basis. It is simply too flimsy. E. The Mid-Trial Motion. E. The Mid-Trial Motion. ____________________ At the close of the government's case, appellant submitted a proffer in support of a renewed motion for a continuance. The proffer suggested a global conspiracy "between the Israeli intelligence services and the CIA," and asserted that he had witnesses who "would testify about such matters as the Israeli defense industry" and "[t]he method by which the building of Israeli religious schools is financed by Hasidic Jews in the United States who engage in money laundering." Appellant claimed that his counsel needed time to investigate the matters described in the proffer. The district court found the proffer to be "too vague 31 and unsubstantiated to constitute a basis for granting a continuance" because its "conclusory allegations" offered no explanation as to its relevancy to the case. Moreover, the court found no evidence that diligent efforts had been made to assure availability of the testimony and documents in a proper time frame. Hence, the court determined that the proffer afforded an inadequate basis for the requested continuance. We discern no abuse of discretion. While the proffer weaves a tale of intrigue worthy of an Oliver Stone screenplay, we are unable to distill sufficient relevance or likelihood of success from its sinister allegations to suggest that a continuance, if granted, would have proven useful. IV. MONEY AND DRUGS IV. MONEY AND DRUGS In order to obtain a conviction on the money laundering counts, as charged in the superseding indictment, the government had the burden of proving that the laundered funds were derived from the narcotics trade. See 18 U.S.C. 1956(a)(2). Appellant ___ challenges both the admissibility and the sufficiency of the evidence introduced for this purpose. The challenge is unavailing. A. Standard of Review. A. Standard of Review. __________________ A district court has considerable discretion when determining whether evidence is admissible. See United States v. ___ _____________ Paulino, 13 F.3d 20, 25 (1st Cir. 1994); Zannino, 895 F.2d at 16- _______ _______ 17; United States v. Nivica, 887 F.2d 1110, 1126 (1st Cir. 1989), _____________ ______ 32 cert. denied, 494 U.S. 1005 (1990). Where, as here, the court _____ ______ finds that evidence is relevant, Fed. R. Evid. 401, but the defendant nonetheless objects to it on the ground that its value is overborne by the potential mischief it may cause, Fed. R. Evid. 403, the trial court must "strike a balance between probative worth and likely prejudice." Zannino, 895 F.2d at 16- _______ 17. The district court is the primary arbiter of how these scales should be calibrated. On appeal, we will reverse its determination only if admitting the evidence constituted a palpable abuse of discretion. See United States v. De La Cruz, ___ _____________ ___________ 902 F.2d 121, 124 (1st Cir. 1990); United States v. Rodriguez- ______________ __________ Estrada, 877 F.2d 153, 155-56 (1st Cir. 1989). This is a _______ difficult row to hoe: "Only rarely and in extraordinarily compelling circumstances will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Freeman v. Package Mach. Corp., 865 F.2d 1331, 1340 _______ ____________________ (1st Cir. 1988). When no contemporaneous objection appears of record, the complaining party's burden increases. In that situation, appellate review is for "plain error." United States v. ______________ Sepulveda, 15 F.3d 1161, 1187 (1st Cir. 1993), cert. denied, 114 _________ _____ ______ S. Ct. 2714 (1994); see also Fed. R. Crim. P. 52(b). When the ___ ____ plain error standard prevails, we reverse only if a miscue "so poisoned the well that the trial's outcome was likely affected." Sepulveda, 15 F.3d at 1188 (quoting United States v. Mejia- _________ _____________ ______ 33 Lozano, 829 F.2d 268, 274 (1st Cir. 1987)). ______ A different standard of review takes center stage when a defendant challenges the sufficiency of the evidence supporting his conviction. In that connection, the inquiry turns on whether, "after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. O'Brien, 14 _____________ _______ F.3d 703, 706 (1st Cir. 1994). In performing the requisite analysis, we do not assess the credibility of witnesses, see id., ___ ___ nor do we force the government to disprove every reasonable hypothesis of innocence, see United States v. Echeverri, 982 F.2d ___ _____________ _________ 675, 677 (1st Cir. 1993). B. National Origin Evidence. B. National Origin Evidence. ________________________ Appellant contends that the prosecution made unfair use of impermissibly suggestive innuendo and stereotypes about Colombians, thereby inviting reversal. Appellant's argument focuses on evidence adduced, or remarks made, at four different points during his trial. First, appellant accuses the government of eliciting testimony concerning the birthplaces of Escobar and Garcia (both of whom were born in Colombia), while not inquiring about any other individual's place of birth. Second, the court permitted Sharir to testify that appellant told him to be careful because he was dealing with Colombians, who would go after his family if they were crossed. Third, when Donald Semesky, an IRS 34 agent, offered expert testimony as to the modus operandi of _____ ________ Colombian drug cartels, he mentioned, among other things, that two Colombian cartels control the illegal importation of cocaine into the United States, and that their narcotics trafficking generates much cash, necessitating money laundering. Fourth, the government's summation hammered these same points. Due to the singular importance of keeping our criminal justice system on an even keel, respecting the rights of all persons, courts must not tolerate prosecutors' efforts gratuitously to inject issues like race and ethnicity into criminal trials. See McClesky v. Kemp, 481 U.S. 279, 309 & n.30 ___ ________ ____ (1987); United States v. Doe, 903 F.2d 16, 21 (D.C. Cir. 1990). _____________ ___ Emphasizing a person's national origin not only may raise concerns of relevancy, undue prejudice, and prosecutorial misconduct, but also may pose issues of constitutional dimension. See, e.g., United States v. Vue, 13 F.3d 1206, 1213 (8th Cir. ___ ____ _____________ ___ 1994); United States v. Rodriguez Cortes, 949 F.2d 532, 541 (1st _____________ ________________ Cir. 1991). This does not mean, however, that all evidence touching ___ upon race or national origin automatically must be excluded. A trial involves a search for the truth, and, as such, it cannot be entirely antiseptic. The trick is to separate impermissible uses of highly charged evidence from those uses that are proper and permissible. See United States v. Alzanki, ___ F.3d ___, ___ ___ _____________ _______ (1st Cir. 1995) [No. 94-1645, slip op. at 25-26]; Doe, 903 F.2d ___ at 25. Thus, while it has proven acceptable on occasion for a 35 prosecutor to introduce evidence of oppressive Kuwaiti customs to buttress the reasonableness of the victim's professed belief, see ___ Alzanki, ___ F.3d at ___ [slip op. at 26], or to make an _______ "unembellished reference to evidence of race simply as a factor bolstering an eyewitness identification of the culprit," Doe, 903 ___ F.2d at 25 (dictum), or to remark that an Iranian defendant likely assumed that his "American wife" would not be searched at customs, United States v. Tajeddini, 996 F.2d 1278, 1285 (1st ______________ _________ Cir. 1993),14 or to describe drugs as coming from Colombia to give the jury a complete view of the conspiracy's endeavors to import cocaine, see United States v. Ovalle-Marquez, 36 F.3d 212, ___ _____________ ______________ 220 (1st Cir. 1994), cert. denied, 115 S. Ct. 1322 (1995), _____ ______ aggressive prosecutors sometimes go too far. When that occurs, courts must act. We have, for instance, reversed convictions when, as in Rodriguez Cortes, the government's strategem _________________ blatantly invited the jury to find the defendant guilty by reason of his national origin. See Rodriguez Cortes, 949 F.2d at 541 ___ ________________ (finding abuse of discretion in admission of defendant's Colombian identification card); see also Vue, 13 F.3d at 1212-13 ___ ____ ___ (reversing conviction because district court admitted testimony  ____________________ 14It is noteworthy that in Tajeddini the prosecutor made the _________ challenged comment in an effort to rebut the defendant's protest that he could not have known that he was smuggling heroin because he did not try to hide the drugs in a secret compartment in his luggage. See 996 F.2d at 1285. In that respect, Tajeddini ___ _________ resembles United States v. Khan, 787 F.2d 28, 34 (2d Cir. 1986) _____________ ____ (finding defendant's claim that he lacked the wherewithal to be a major drug dealer properly rebutted by evidence about the modest price of heroin in Pakistan, the practice among Pakistani dealers of selling drugs on credit, and the tendency of all Pakistanis, regardless of wealth, to dress alike). 36 tying defendant's ethnic group, the Hmong, to 95% of the local opium trade); Doe, 903 F.2d at 23-27 (reversing conviction due to ___ admission of testimony on modus operandi of Jamaican drug gangs _____ ________ and prosecutor's inflammatory comments thereon). In determining the propriety of evidence implicating ethnicity or national origin, context is critical. In the case at bar, all the evidence about Colombia, viewed in context, was properly admitted and used. By like token, the prosecutor's comments were not beyond the pale. Appellant's first contention is factually incorrect. The prosecutor asked several witnesses other than Escobar and Garcia (e.g., Sharir and Slomovits) where they were born. Seen ____ in this light, the casual questioning about place of birth, not objected to at trial, cannot conceivably plunge to the plane of plain error. Similarly, Sharir's testimony that Saccoccia told him to be wary because he was dealing with Colombians is highly probative on the issue of appellant's knowledge that the laundered funds were derived from illegal activities. Moreover, common sense suggests that drug traffickers are more likely than, say, Avon ladies, to harm the families of business associates if a deal sours. It is, therefore, a gross exaggeration to declare that the evidence had no purpose other than to suggest that Colombians are prone to violence. Similarly, Agent Semesky's testimony was relevant and appropriate in several respects. First, it went a long way 37 toward explaining the nature of money laundering and the basis for appellant's activities. This is a perfectly legitimate use of evidence. See Doe, 903 F.2d at 19 & n.21 (citing cases). ___ ___ Even the testimony about the cartels' control over the American drug trade was relevant on the issue of whether the cash that appellant scrubbed clean was in fact derived from illegal activities. The evidence could support a jury's plausible, though circumstantial, inference of an illicit source of funds based on appellant's repeated wire transfers of millions of dollars in laundered money to a country that functions as the nerve center of the world's traffic in cocaine. The only remotely problematic references to Colombia are those contained in the summation. For example, a prosecutor stated: [Agent Semesky] told you as an expert, something you probably already knew, that cocaine comes from Colombia. That it's run by cartels in Colombia. That they ship the money up here and it gets out into the streets. That's the reason for all these ten and twenty dollar bills. These are grams of coke . . . . Later on, after reminding the jurors that the case involved roughly $100,000,000 "generated on the streets of New York that is sent back to Colombia," a prosecutor posed a series of rhetorical questions: If we're not talking about cocaine, what are we talking about? Is this from coffee vendors? Is this money coming from people out in the streets selling Colombian coffee? Oh, I have had a good day today. Five hundred thousand dollars, unfortunately, it's all in twenty dollar bills. Think of the 38 change they had to give. This is a case about Roberto Juri and Tulio Alzate and Fernando Duenas and Stephen Saccoccia, not Juan Valdez, ladies and gentlemen. The evidence in this case and the only reasonable inference you can draw is drug money. Appellant did not interject a contemporaneous objection to any of these comments.15 It strains credulity to suggest, as Saccoccia does, that the prosecution was arguing that only drugs and coffee come from Colombia. The remark about coffee vendors was obviously intended to show the unlikelihood that any legitimate business would generate the volume of cash that flowed through appellant's operation. The quip about Juan Valdez,16 while an unnecessary  ____________________ 15The closing argument also contained the following passage: [W]e are asking you to draw some outrageous innuendo that because people are Colombians, they are involved in cocaine. The Government simply is not suggesting that. What we are suggesting is based on the evidence, the cocaine comes from Colombia. Juan Carlos Garcia testified that he was born in Colombia and Raoul Escobar testified that he was born in Colombia. This defendant went on two occasions he went to Colombia to discuss money-laundering with Tulio Alzate and Roberto Juri. Although we cannot tell whether the prosecutor misspoke or whether his remarks were mistranscribed, we believe that the first sentence contains an error. The overall meaning of the passage is clear in urging the jury not to make a prejudicial inference based solely on nationality. 16We take judicial notice that the fictional Juan Valdez is a prominent persona in coffee advertisements. See Fed. R. Evid. ___ 201(b)(1); 21 Charles A. Wright & Kenneth W. Graham, Jr., Federal _______ Practice and Procedure 5105, at 489 (1977) (noting that facts ______________________ that are "generally known within the territorial jurisdiction of the trial court" include those which "exist in the unaided memory of the populace"). Clad in a serape and sombrero and accompanied 39 aside, cannot be said to emphasize emotion over facts. See Doe, ___ ___ 903 F.2d at 25. Viewed as a whole, the prosecution's evidence and comments about Colombia provide no basis for disturbing the jury's verdict. Before ending our elaboration we note, as an adscript, that appellant himself is not Colombian, but is of Italian ancestry. This mitigates one of the most serious dangers of evidence about a person's national origin: that the jury will believe the defendant is guilty because of stereotyping. Appellant has not cited any case in which a court has reversed a conviction due to evidence touching upon a national origin not shared by the defendant. This is not to say that injustice and unfair prejudice may never result from a conviction based on improper use of evidence about the national origin of a defendant's friends or business associates. But, the ricochet effect of such evidence is likely to do less harm, on average, than the direct impact of evidence about the defendant's country of origin. C. The Dog Show. C. The Dog Show. ____________ Appellant faults the district court for admitting evidence that Bosco von Schleudersitz (Bosco), a nine-year-old German shepherd trained to detect narcotics,17 alerted to the  ____________________ by his faithful donkey, Valdez regularly appears in supermarkets and private kitchens to remind consumers of the virtues of Colombian coffee. 17The dog's original trainer, a former Luftwaffe pilot, named him after the German word for "ejection seat." 40 presence of drugs in bundles of cash brought to local banks by appellant's henchmen. At trial Bosco's handler, Sgt. Edward Conley, testified that he took Bosco to a bank in Cranston, Rhode Island on March 23, 1990. Bosco "searched" several areas of the bank, such as the vault and teller stations, and did not react. Conley then took Bosco to a room in which a bag containing $9,000 was located, and, when he instructed Bosco to search for drugs, the dog "showed a strong, positive aggressive alert, shaking the bag, ripping it apart, grabbing the money in his mouth, and ripping the money." According to Conley, a similar search, with similar results, took place on April 20, 1990, at a different bank in Johnston, Rhode Island. In each instance, the currency to which Bosco reacted had been brought to the bank by appellant's associates in order to purchase cashier's checks. To meet this testimony, appellant called two experts who attacked the reliability of Bosco's response. One of these witnesses, Thomas Knott, testified that the manner in which Conley orchestrated the sniff tests did not properly control against the possibility of a false alert. The second expert, Dr. James Woodford, criticized the testing protocol because the sniff tests were not verified by chemical field tests. Woodford also testified as to the widespread contamination of United States currency with illegal drugs and the tenuous nature of the link between a canine alert and a conclusion that particular currency derived from narcotics trafficking ("[I]f there were drugs on 41 that money, it doesn't mean that it is drug money.").18 Appellant insists that the probative value of the dog sniff evidence is substantially outweighed by its prejudicial effect, and that the district court erred in refusing to exclude the evidence under Fed. R. Evid. 403. This claim deserves serious attention, for recent decisions about the evidentiary value of a trained dog's alert to currency are not uniform. Compare, e.g., United States v. U.S. Currency, $30,060.00, 39 _______ ____ ______________ __________________________ F.3d 1039, 1041-43 (9th Cir. 1994) (noting widespread contamination and concluding that "the probative value of a positive dog alert in currency forfeiture cases in Los Angeles is significantly diminished"); United States v. Carr, 25 F.3d 1194, _____________ ____ 1215 (3d Cir.) (Becker, J., concurring in part and dissenting in part) (stating that "a substantial portion of United States currency now in circulation is tainted with sufficient traces of controlled substances to cause a trained canine to alert"), cert. _____  ____________________ 18Appellant criticizes the district court for prohibiting Dr. Woodford from testifying more fully about a Drug Enforcement Administration (DEA) report that found one-third of the bills in a random sample of currency to be contaminated by cocaine. See ___ Jones v. DEA, 819 F. Supp. 698, 720 (M.D. Tenn. 1993) (citing DEA _____ ___ report). This criticism is overblown. The court permitted the witness to describe the report's conclusions and to indicate that he had relied on those findings. See Fed. R. Evid. 703 ___ (authorizing reliance on facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject"). The court's decision to preclude attribution of the report was well within its discretion. Moreover, because the report was available to appellant despite the government's alleged failure to disclose it in a timeous manner, the rule of Brady v. Maryland, 373 U.S. 83 _____ ________ (1963), does not profit appellant's cause. See Sepulveda, 15 ___ _________ F.3d at 1178 ("The lack of demonstrable prejudice sounds the death knell for a `delayed discovery' claim."); Devin, 918 F.2d _____ at 289 (similar). 42 denied, 115 S. Ct. 742 (1994); and Jones v. DEA, 819 F. Supp. ______ ___ _____ ___ 698, 721 (M.D. Tenn. 1993) (suggesting that "continued reliance of courts and law enforcement officers on dog sniffs to separate `legitimate' currency from `drug-connected' currency is logically indefensible") with, e.g., United States v. $67,220.00 in U.S. ____ ____ ______________ ___________________ Currency, 957 F.2d 280, 285-86 (6th Cir. 1992) (noting that "a ________ positive dog reaction [to currency] is at least strong evidence of a connection to drugs"); United States v. $215,300 U.S. ______________ ______________ Currency, 882 F.2d 417, 419 (9th Cir. 1989) (upholding forfeiture ________ based in part on a canine alert to currency), cert. denied, 497 _____ ______ U.S. 1005 (1990); and United States v. Hernando Ospina, 798 F.2d ___ _____________ _______________ 1570, 1583 (11th Cir. 1986) (finding canine sniff evidence to be both probative and helpful to the jury in concluding that laundered money constitutes drug proceeds). In the end, we reject appellant's asseveration. We do not think that the district court, based on the information of ____________________________ record in this case, abused its discretion in admitting the _____________________ canine sniff evidence.19 Even though widespread contamination of currency plainly lessens the impact of dog sniff evidence, a trained dog's  ____________________ 19Because appellant neither introduced nor proffered the materials discussed by other courts suggesting that a very high percentage of United States currency is contaminated with drug residue, see, e.g., Carr, 25 F.3d at 1215 n.6 (reviewing ___ ____ ____ estimates suggesting that between one-third and 97% of United States currency is drug-contaminated); United States v. $639,558 ______________ ________ in U.S. Currency, 955 F.2d 712, 714 n.2 (D.C. Cir. 1992) _________________ (similar), those materials could not inform the district court's decision. Cf. Carr, 25 F.3d at 1202 n.3 (declining to take ___ ____ judicial notice that nearly all currency contains detectable traces of illegal narcotics). 43 alert still retains some probative value. Ordinary experience suggests that currency used to purchase narcotics is more likely than other currency to have come into contact with drugs. Here, moreover, the evidence supports an inference that Bosco's frenzied reaction was caused by more than a mere trace of contamination. The record contains corroboration of Bosco's olfactory evidence. Several witnesses testified that ordinary human senses could detect something unusual about the money that appellant's associates brought to the banks. One teller testified that he occasionally noticed that the money felt "dusty . . . almost floury from pizza dough, that type of feeling." Another teller reported that she noticed an odor or fragrance, akin to that of an orchid. This evidence, along with Conley's testimony that the dog did not react in other areas of the banks, buttressed the lower court's belief that the dog sniff evidence had probative force. Conversely, though the dog sniff evidence likely bolstered the prosecution's case and served to inculpate the defendant, we are not convinced that it presented a substantial risk of unfair prejudice. See generally Rodriguez-Estrada, 877 ___ _________ _________________ F.2d at 156 ("By design, all evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided."). After all, ______ the court allowed appellant to call two expert witnesses who debunked Bosco's reaction to the currency. If, on one hand, the jury believed the experts, it doubtless discounted the value of 44 the canine alert. If, on the other hand, the jury disbelieved appellant's experts, it was entitled to place a greater value on the canine sniff. See, e.g., Quinones-Pacheco v. American ___ ____ ________________ ________ Airlines, Inc., 979 F.2d 1, 5 (1st Cir. 1992) (explaining that _______________ "expert opinion testimony, even if not directly contradicted, is not ordinarily binding on a jury"). In any event, considering the high degree of deference we owe to a district court's balancing of probative value against unfairly prejudicial effects, see Rodriguez-Estrada, 877 F.2d at ___ _________________ 156, we cannot say that the trial court abused its wide discretion in admitting the evidence of Bosco's reaction to the currency delivered by appellant's associates. D. Testimony of Juan Carlos Garcia. D. Testimony of Juan Carlos Garcia. _______________________________ Juan Carlos Garcia, a participant in the money laundering activities, testified for the government at appellant's trial. Garcia said that in 1987, while living in the United States, he began working for his brother-in-law, Fernando Duenas. Following Duenas' orders, Garcia would respond when paged on his beeper, arrange to retrieve a quantity of cash, and deposit the money in one of several bank accounts maintained under the names of Duenas, Duenas' wife (Garcia's sister), or Duenas' brother. By the end of 1987 the cash had mushroomed from $10,000-$20,000 per shipment to $150,000-$200,000 per shipment. Garcia met appellant for the first time in May 1989. With Duenas' blessing, the two men agreed that appellant would accept bundles of cash from Garcia and send the money to 45 Colombia. On countless occasions thereafter, appellant received money from Garcia and redirected it to accounts controlled by Duenas. At trial, the district court permitted Garcia, over objection, to testify that, in 1988, Duenas told him that a man named "Caesar" would call and give him something other than money. Garcia knew Caesar because Caesar had brought money to him on a previous occasion. Caesar called and informed Garcia that he would be delivering a kilogram of cocaine. Subsequently, Caesar handed Garcia a shopping bag containing a block of a granular substance, beige in color. Garcia tried to sell the merchandise, as directed by Duenas, but he was unable to do so. He eventually delivered the package to another individual on Duenas' instructions. Appellant assigns error to the trial court's admission of the testimony anent the package. The assignment of error has twin foci: (1) the conversations between Duenas and Garcia, and (2) Caesar's assurance that the package contained cocaine.20 We believe that the court lawfully admitted the evidence. The Evidence Rules provide that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not considered hearsay. Fed. R. Evid. 801(d)(2)(E). Here, the first prong of the rule is satisfied.  ____________________ 20The court gave limiting instructions referable to this evidence, telling the jury that it could only be considered on the issue of whether the money appellant laundered was in fact the proceeds of narcotics trafficking. 46 The record contains adequate evidence that Duenas, Garcia, and Caesar were involved in a single conspiracy to launder money. By joining that conspiracy at a later date, appellant effectively adopted coconspirator declarations previously made. See United ___ ______ States v. Murphy, 852 F.2d 1, 8 (1st Cir. 1988), cert. denied, ______ ______ _____ ______ 489 U.S. 1022 (1989); see also United States v. Baines, 812 F.2d ___ ____ _____________ ______ 41, 42 (1st Cir. 1987) ("[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight or conduct regardless of whether he is aware of just what it is composed."). The second prong of the rule is also satisfied; the statements were made during and in furtherance of the very conspiracy that appellant joined. For one thing, we have held that "when a number of people combine efforts to manufacture, distribute and retail narcotics, there is a single conspiracy, a `chain conspiracy,' despite the fact that some of the individuals linking the conspiracy together have not been in direct contact with others in the chain." United States v. Rivera-Santiago, 872 _____________ _______________ F.2d 1073, 1080 (1st Cir.), cert. denied, 492 U.S. 910 (1989). _____ ______ For another thing, money laundering and narcotics trafficking are symbiotic activities, each of which may require the other in order to continue. Duenas' efforts to have Garcia sell the cocaine for him and the group's ongoing campaign to launder money can rationally be seen as adjacent links in the lengthy chain that binds up the narcotics trafficking cycle. Thus, the 47 district court acted within its proper province in deeming both activities part of the same conspiracy, and in holding that the attempted narcotics sale was in furtherance of it. Consequently, the challenged statements were properly admitted under Rule 801(d)(2)(E). We note, moreover, as did the district court, that a statement made by an unavailable declarant21 falls outside the hearsay exclusion if the statement "at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3). Duenas' and Caesar's statements to Garcia were tantamount to admissions that they were dealing cocaine. Because such statements were against the declarants' penal interest, they came within the encincture of Rule 804(b)(3) and were admissible on that basis. Finally, appellant's suggestion that the admission of Garcia's testimony abridged the Confrontation Clause is off base. It is well settled that a statement falling within a firmly rooted hearsay exception will not be held to violate the Confrontation Clause. See Ohio v. Roberts, 448 U.S. 56, 66 ___ ____ _______ (1980); Puleio v. Vose, 830 F.2d 1197, 1204-05 (1st Cir. 1987), ______ ____ cert. denied, 485 U.S. 990 (1988). It is equally well settled _____ ______ that the exceptions for coconspirator declarations and for  ____________________ 21The district court made an explicit, warrantable finding that Duenas was unavailable for trial. Caesar, whose last name is unknown, apparently has disappeared into thin air. 48 declarations against penal interest are both firmly rooted in our jurisprudence. See Bourjaily v. United States, 483 U.S. 171, 183 ___ _________ _____________ (1987) (discussing coconspirator exception); United States v. _____________ Innamorati, 996 F.2d 456, 474 n.4 (1st Cir. 1993) (discussing __________ declaration against interest exception), cert. denied, 114 S. Ct. _____ ______ 1073 (1994). E. Testimony of Agent Shedd. E. Testimony of Agent Shedd. ________________________ In the late 1980s, the DEA set up a network of sham corporations ostensibly to provide a money laundering service to underworld elements. DEA Special Agent James Shedd participated in this reverse sting operation (dubbed "Operation Pisces"). Duenas dealt with the Pisces network in 1987 and 1988. At trial, a prosecutor suggested that Shedd would testify as follows: "Mr. Duenas told him that ninety-nine percent of the money that he was turning over to the undercover agent was, in fact, drug money." On the basis of this representation, the lower court denied a motion in limine by which the defense sought to exclude Shedd's __ ______ testimony regarding Duenas' statements. Shedd told the jury about thirty-seven transactions in which Duenas supplied cash that the DEA undercover operation laundered for him. Shedd also described several conversations with Duenas in which Duenas reportedly said that he laundered money for Colombian drug traffickers and "that ninety-nine percent of the money that money-launderers deal in Bogota comes from narcotics proceeds." During cross-examination, appellant's counsel 49 challenged Shedd about this statement. Shedd and Duenas conversed in Spanish, and some of their conversations had been recorded. Defense counsel called Shedd's attention to one such conversation. The translation indicated that Duenas made the contested comment during a discussion in which he explained that, although it was against the law, foreign currency routinely circulated in Colombia. He apparently added: "Logically, the [foreign] currency that circulates the most over there . . . is the dollar . . . which ninety-nine percent of it comes from drug dealing." Shedd responded that his direct testimony had been premised not on a single discussion, but on an overall impression gained from a lengthy conversation with Duenas.22 Appellant then moved to strike Shedd's testimony. Judge Torres denied the motion. Appellant maintains that the district court made no fewer than four errors in connection with this testimony. First, appellant posits that Duenas' statements were barred by the hearsay rule. This claim fails. The court was warranted in finding that these were coconspirator declarations and, thus, admissible under Rule 801(d)(2)(E). See, e.g., Sepulveda, 15 ___ ____ _________ F.3d at 1180; Ortiz, 966 F.2d at 714-15. _____ Appellant's second contention is that Duenas' statement, in its true form, was irrelevant because it was  ____________________ 22Shedd also offered the following syllogism: "Ninety-nine percent of the money, of the U.S. dollars that's in Colombia is drug money. He's a money launderer, then ninety-nine percent of the money that he launders comes from drug money." 50 nothing more than a gross generalization about the Colombian economy. We disagree. Though courts are sometimes cautious about admitting abstract data as proof of what actually happened in an individual case, a percentage like "ninety-nine percent" is quite powerful, and far surpasses the usual test that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Trial courts are afforded wide discretion in determining whether evidence clears this low threshold, see United States v. Tierney, 760 F.2d 382, 387 (1st ___ _____________ _______ Cir.), cert. denied, 474 U.S. 843 (1985), and we will disturb an _____ ______ exercise of that discretion only if manifest abuse appears, see ___ Sepulveda, 15 F.3d at 1194; United States v. Griffin, 818 F.2d _________ _____________ _______ 97, 101 (1st Cir.), cert. denied, 484 U.S. 844 (1987). _____ ______ Under this deferential standard, the district court acted within its lawful powers in deeming Duenas' statements relevant to the issue of whether the money appellant laundered was in fact derived from narcotics trafficking. Duenas' remark, even in the diluted form that was heralded on cross-examination, has at least some probative value in ascertaining whether the drug trade was the source of the funds that appellant washed, much as the fact that a lake is contaminated has some probative value in ascertaining whether a stream that feeds the lake is contaminated. Appellant's third sally alleges error in Shedd's 51 explanation that his initial testimony about Duenas' statement was based on an overall impression from several hours of conversation. Although a witness is generally not permitted to testify about his subjective interpretations of what has been said by another person, he may do so if his opinion is rationally based on his perception and is helpful either to an understanding of his testimony or to the determination of a fact in issue. See ___ United States v. Cox, 633 F.2d 871, 875 (9th Cir. 1980), cert. _____________ ___ _____ denied, 454 U.S. 844 (1981). In this case, we conclude that the ______ district court acted lawfully in leaving the testimony intact. Shedd tendered his explanation of Duenas' statement in direct response to a question by appellant's counsel on cross- examination. The answer was not followed by a timely objection or motion to strike. While appellant challenged Shedd's qualifications to offer an opinion about Duenas' state of mind in a subsequent motion to strike, this was too late. See United __________ ___ ______ States v. Moore, 923 F.2d 910, 915 (1st Cir. 1991) (holding that ______ _____ Evidence Rule 103 requires that objections be made at the time evidence is offered); United States v. Parodi, 703 F.2d 768, 783 _____________ ______ (4th Cir. 1983) (same). The proper time to have registered an objection to Shedd's explanation was immediately after it was uttered. Accordingly, any objection to the explanation has been waived. And, moreover, even if the court erred in permitting the answer to stand, it looms as harmless beyond all doubt in the context of a very efficacious cross-examination. Appellant's final contention is that the prosecution 52 knowingly offered Shedd's testimony despite having a transcript that refuted it, and, to make a bad situation worse, deliberately withheld the transcript from the defense. Having carefully examined the record, we find no valid reason to conclude that the prosecution intentionally mischaracterized Shedd's proposed testimony during the in limine hearing, and no hint of __ ______ prosecutorial misconduct in the handling of the transcript. At any rate, it is perfectly clear that defense counsel obtained the unexpurgated transcript in ample time to conduct a very effective cross-examination on the following day. There was no prejudice and, hence, no reversible error. See Devin, 918 F.2d at 290. ___ _____ F. The Wiretap Tapes. F. The Wiretap Tapes. _________________ The district court allowed the prosecution to introduce tape recordings of two conversations in which Saccoccia's employees made reference to drugs. The tapes are not entirely audible, and the parties disagree about what was said during two potentially significant conversations. The government asserts that, in a discussion that took place at Trend's offices, Kenneth Saccoccio referred to cash that he and Hurley were counting as "fuckin' drug money." Appellant claims that this portion of the tape was inaudible. The other conversation took place at Saccoccia Coin Company. In it, Stanley Cirella spoke to Stephen Pizzo about an ongoing investigation of appellant's organization. According to the government, Cirella declared that "he" a pronoun that we take in context to refer to Saccoccia had told him that "they [the authorities] ain't doin' this [conducting the 53 investigation] because of the coke, they're doin' this because of the washing of money." Appellant contends that Cirella said "gold" rather than "coke." The issue on appeal is whether the district court abused its discretion in allowing the taped conversations to be presented to the jury in conjunction with the government's transcript. In appellant's view, the inaudible portions of the tapes are so critical as to make the rest more misleading than helpful. See United States v. Carbone, 798 F.2d 21, 24 (1st Cir. ___ _____________ _______ 1986). Having listened to the tapes, see United States v. ___ ______________ Carbone, 880 F.2d 1500, 1503 (1st Cir. 1989), cert. denied, 493 _______ _____ ______ U.S. 1078 (1990), we believe that they are reasonably audible and that the judge appropriately left their interpretation to the jury. What was or was not said during a tape-recorded conversation is ordinarily a question of fact, not a question of law. Appellant's fallback position is that, even if the government accurately transcribed the tapes, the lower court erred in failing to tell the jury that any statements about the source of the laundered money were relevant only to the speakers' subjective beliefs. This position hinges on the premise that, in the absence of a concinnous foundation showing the speakers' knowledge, the comments cannot constitute proof vis-a-vis Stephen Saccoccia (who did not participate in the discourse) as to whether the money in fact emanated from drug transactions. We disagree with appellant's premise for two reasons. 54 First, Evidence Rule 104(b) provides that "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." In addressing foundational issues, the trial judge acts as a gatekeeper, examining the evidence and deciding "whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." Huddleston v. United __________ ______ States, 485 U.S. 681, 690 (1988). The conditional fact may be ______ based on "reasonable inference from the circumstantial evidence." Onujiogu v. United States, 817 F.2d 3, 5 (1st Cir. 1987); see, ________ ______________ ___ e.g., Veranda Beach Club Ltd. Partnership v. Western Sur. Co., ____ _____________________________________ _________________ 936 F.2d 1364, 1372 (1st Cir. 1991). In light of the wide discretion afforded to trial judges in deciding whether an adequate foundation has been laid, see Real v. Hogan, 828 F.2d 58, 64 (1st Cir. 1987), we think that ___ ____ _____ Judge Torres acted unexceptionably in determining that the jury could rationally infer that appellant's employees would not refer to the cash as "drug money" without some basis in fact. The men who made the statements were substantially involved in appellant's operation and could easily have had opportunities to learn of the money's origins. As we have indicated, there is a second reason why appellant is mistaken insofar as he sees personal knowledge about the source of the funds as a prerequisite to general admissibility of the comments. Both statements were made by 55 coconspirators and are thus admissible under Evidence Rule 801(d)(2)(E) without a showing of personal knowledge. See United ___ ______ States v. Goins, 11 F.3d 441, 443-44 (4th Cir. 1993), cert. ______ _____ _____ denied, 114 S. Ct. 2107 (1994) (holding that the personal ______ knowledge requirement of Evidence Rule 602 "does not apply to statements of a co-conspirator admissible as non-hearsay under Rule 801(d)(2)(E)"); cf. Brookover v. Mary Hitchcock Memorial ___ _________ ________________________ Hosp., 893 F.2d 411, 415-18 (1st Cir. 1990) (finding no _____ requirement of personal knowledge for admission of a statement under Rule 801(d)(2)(D)). For these two reasons the challenged statements were properly before the jury, and the court acted appropriately in refusing appellant's proposed limiting instruction. G. The Sufficiency of the Evidence. G. The Sufficiency of the Evidence. _______________________________ Viewing the evidence as a whole and keeping in mind that the prosecution's burden of proof can be satisfied by either direct or circumstantial evidence, see O'Brien, 14 F.3d at 706, ___ _______ we conclude that a rational factfinder could determine beyond a reasonable doubt that the money appellant laundered was in fact derived from the narcotics trade. Rehashing the evidence would serve no useful purpose. We do take special note, however, that appellant's money-washing operation matched Agent Semesky's description of how Colombian drug rings traditionally laundered ill-gotten gains, and that, as the district court observed, it is difficult to conceive of any non-narcotics-related business that could create a comparable 56 cascade of creased currency. That the waves of cold cash typically appeared in well-worn bills of small denomination makes the tie tighter. Then, too, the jury heard competent evidence that Duenas, who furnished money for appellant to launder, himself performed monetary ablutions for narcotics traffickers (and, on one occasion, supplied cocaine for an associate to sell). The canine alert to currency that appellant's associates had gathered furnished some added support for the theory that the money emanated from drug sales. Finally, appellant's own employees suggested on two occasions that the washed funds were linked to narcotics. Taken in the ensemble, these pieces of evidence provide an adequate foundation on which the jury could build a finding that appellant laundered drug money. Jurors, after all, are not expected to resist commonsense inferences based on the realities of human experience. See Veranda Beach Club, 936 F.2d at 1372 ___ ___________________ ("The law is not so struthious as to compel a factfinder to ignore that which is perfectly obvious."); United States v. _____________ Ingraham, 832 F.2d 229, 240 (1st Cir. 1987) (similar), cert. ________ _____ denied, 486 U.S. 1009 (1988).  ______ V. FORFEITURE V. FORFEITURE The court bifurcated appellant's trial, separating the substantive criminal charges from the forfeiture claims. Appellant waived his right to trial by jury on the latter counts. All counsel assured the judge that they had no additional evidence to present at the second anticipated phase of the trial 57 and, therefore, that the hearing on forfeiture would "be purely a matter of legal argument." Accordingly, the judge scheduled arguments for March 26, 1993. On the assigned date, appellant was before a California court in connection with a separate action. His counsel objected to proceeding in appellant's absence. See Herring v. New York, ___ _______ ________ 422 U.S. 853, 863-65 (1975) (remarking a defendant's constitutional right to make a closing argument, even in a bench trial); Fed. R. Crim. P. 43(a) ("The defendant shall be present at . . . every stage of the trial including . . . the imposition of sentence . . . ."). Specifically, counsel stated that (1) he required appellant's assistance "in responding to whatever it is the government may say about the evidence as it relates to the law that's going to be argued," and (2) appellant might wish to exercise his right to make a closing statement. The court then offered to proceed on the understanding that appellant's counsel could make incremental arguments at the sentencing hearing, with appellant present.23 When counsel persisted in his original position, the court terminated the session. The disposition hearing was held on May 12, 1993. Appellant was present throughout. The district court determined that he should forfeit all the money laundered during the life of  ____________________ 23Noting that forfeiture is part of the sentencing process, and that Saccoccia would be present for sentencing, the court suggested to defense counsel that "to the extent the sentencing includes the potential for forfeiture order, you can be heard on that issue just as you would on any other sentencing issue at that time." 58 the conspiracy, and, using bank records, fixed the amount at $136,344,231.86. See United States v. Saccoccia, 823 F. Supp. ___ _____________ _________ 994, 1006 (D.R.I. 1993). At the government's urging, the court subsequently amended the forfeiture order to specify substitute assets for forfeiture.24 See 18 U.S.C. 1963(m) (1988). ___ Appellant assigns error. He strives to persuade us, inter alia, that applicable extradition doctrines barred _____ ____ forfeiture; that the court ignored the strictures of due process; and that the forfeiture order swept too broadly. We are not convinced. A. Extradition/Forfeiture. A. Extradition/Forfeiture. ______________________ Appellant asserts that the forfeiture entered against him violates the rule of specialty because it is tantamount to prosecution and conviction for an offense on which extradition was neither sought nor granted. He also suggests that the principle of dual criminality prohibits the forfeiture because Swiss law does not render a defendant criminally liable for forfeiture by reason of unlawful money transfers. These initiatives fail because they ignore the irresistible conclusion that, at least for present purposes, criminal forfeiture is a  ____________________ 24In discussing substitutions, Saccoccia seeks to incorporate by reference his codefendants' plaint that the court improperly allowed the government to add property subject to forfeiture while the cases were on appeal. We reject this remonstrance. The district court did not "amend" its judgment, but, rather, ordered forfeiture of substitute assets based on a supportable finding that appellant had transferred forfeited proceeds beyond the jurisdiction of the court. Contrary to appellant's intimation, this procedure did not insult his constitutional entitlement to due process, nor did it run afoul of the Double Jeopardy Clause. 59 punishment, not a separate criminal offense. We think that the genealogy of modern criminal forfeiture is important. The device is born out of the mating of two historically distinct traditions. One parent is civil forfeiture, an in rem proceeding rooted in the notion that __ ___ property used in, or intimately associated with, criminal activity acquires a taint, and that such property is therefore forfeitable even if not owned by the miscreant. See United ___ ______ States v. Sandini, 816 F.2d 869, 872 (3d Cir. 1987). The second ______ _______ parent is old-hat criminal forfeiture, which traditionally operated as an incident of a felony conviction in personam __ ________ against a convicted defendant, requiring him to forfeit his property to the crown. See United States v. Nichols, 841 F.2d ___ _____________ _______ 1485, 1486 (10th Cir. 1988). The forfeiture provisions of RICO combine both traditions because they act in personam against the __ ________ defendant, yet require a nexus between the forfeited property and the crime.25 See id. at 1486-88 (reviewing historical aspects ___ ___ of forfeiture); Saccoccia, 823 F. Supp. at 1001. _________ Partially as a result of this mixed heritage, courts have struggled to categorize the resultant hybrid modern criminal forfeiture as either a punishment for, or an element  ____________________ 25The district court imposed forfeiture pursuant to both a money laundering statute, see 18 U.S.C. 982, and a RICO ___ statute, see id. 1963. Although there are some slight ___ ___ differences in the operation of the two statutes, see Saccoccia, ___ _________ 823 F. Supp. at 1001-05, these differences do not affect our analysis of the extradition issues. For simplicity's sake, we refer only to the RICO forfeiture statute. Nonetheless, our discussion is equally applicable to criminal forfeiture under the money laundering laws. 60 of, a criminal offense. The majority view regards criminal forfeiture for narcotics offenses under 21 U.S.C. 853 as part of the punishment imposed on a defendant. See, e.g., United ___ ____ ______ States v. Elgersma, 971 F.2d 690, 694 (11th Cir. 1992) (holding ______ ________ that "criminal forfeiture is part of the sentencing process and not an element of the crime itself"); United States v. Hernandez- _____________ __________ Escarsega, 886 F.2d 1560, 1576-77 (9th Cir. 1989) (similar), _________ cert. denied, 497 U.S. 1003 (1990); Sandini, 816 F.2d at 875 _____ ______ _______ (similar). Other straws in the wind blow in the same direction. See, e.g., Alexander v. United States, 113 S. Ct. 2766, 2772 ___ ____ _________ ______________ (1993) (characterizing a RICO forfeiture order against a pornography merchant as "a punishment for past criminal conduct"); United States v. Kingsley, 851 F.2d 16, 18 n.2 (1st _____________ ________ Cir. 1988) (noting in dictum that "in personam criminal __ ________ forfeiture . . . is intended to directly punish persons convicted of a criminal offense by forcing them to forfeit the proceeds obtained as a result of that offense"). Withal, there remains some nagging doubt about whether forfeiture is strictly a punishment as opposed to a separate substantive charge. See, ___ e.g., Caplin & Drysdale, Chtd. v. United States, 491 U.S. 617, ____ ________________________ _____________ 628 n.5 (1989) (stating in dictum that "forfeiture is a substantive charge in the indictment against a defendant"); Fed. R. Crim. P. 31(e) advisory committee's note (noting committee's assumption that "the amount of the interest or property subject to criminal forfeiture is an element of the offense to be alleged and proved"). 61 We resolve that doubt favorably to the government to the extent necessary to rebut Saccoccia's claims. Thus, we hold that, for purposes of extradition law, forfeiture is neither a free-standing criminal offense nor an element of a racketeering offense under RICO, but is simply an incremental punishment for that proscribed conduct. Consequently, a defendant may be subjected to a forfeiture order even if extradition was not specifically granted in respect to the forfeiture allegations. We base this ruling primarily on three pillars: the weight of authority counsels in this direction; the punitive aspects of criminal forfeiture predominate (among other things, RICO forfeiture retains the functional traits of a punishment since it is definitively imposed only after the defendant's guilt has otherwise been determined); and, finally, treating criminal forfeiture as a punishment in the extradition milieu is consistent with the emphasis that the doctrine of dual criminality places on the unlawfulness of the defendant's conduct, and, correspondingly, on the lack of any requirement that a crime have identical elements or penalties in the two jurisdictions, see Collins, 259 U.S. at 312; Levy, 905 F.2d at ___ _______ ____ 328. It follows, therefore, that appellant was properly subjected to a criminal forfeiture order even if he was not extradited on forfeiture charges and even if Swiss law does not provide for criminal forfeiture under comparable circumstances. B. Procedural Aspects. B. Procedural Aspects. __________________ 62 Appellant also declaims that the procedure employed with regard to the forfeiture order deprived him of four intertwined rights: the right to present a closing argument, the right to be present to assist counsel during the closing argument, the right to entry of a verdict of forfeiture, and the right to be present for entry of a verdict. This quadrat of complaints is unavailing. The first two grievances are not supported by the record. Even though appellant was absent on March 26, the court offered his counsel the opportunity to make further arguments at the disposition hearing (at which appellant was in attendance). Affording appellant this opportunity satisfied his right to make a closing statement and his right personally to assist counsel. The fact that appellant chose not to avail himself of the afforded opportunity is beside the point. Appellant's next contention arises out of the idea that the court violated Fed. R. Crim. P. 32(b) and 31(e) by ordering forfeiture without entering a special verdict. Because appellant did not object to the district court's decision to make an oral forfeiture order followed by a written decision, however, our review is limited to a hunt for plain error. See United States ___ _____________ v. Taylor, ___ F.3d ___, ___ (1st Cir. 1995) [No. 93-1381, slip ______ op. at 6-7]; Griffin, 818 F.2d at 99. _______ To be sure, Rule 31(e) requires that a special verdict be returned when the indictment or information contains a forfeiture allegation. But, Rule 31(a) makes it transpicuously 63 clear that this requirement is geared to jury trials. See Fed. ___ R. Crim. P. 31(a) (stating that the verdict "shall be returned by the jury to the judge in open court"). When the judge is the factfinder, the procedure for making factual determinations is governed by Fed. R. Crim. P. 23(c). That rule provides: In a case tried without a jury the court shall make a general finding and shall in addition, on request made before the general finding, find the facts specially. Such findings may be oral. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein. Fed. R. Crim. P. 23(c). In the instant case, the judge entered an oral order, followed very shortly by a written memorandum limning his findings of fact. In our opinion, this procedure did not constitute plain error. See, e.g., Gibbs v. Buck, 307 U.S. 66, ___ ____ _____ ____ 78 (1939); see also Aoude v. Mobil Oil Corp., 862 F.2d 890, 895 ___ ____ _____ _______________ (1st Cir. 1988) (observing that reversal "would be an empty ritual" once the lower court had remedied its original error and belatedly made written findings). Thus, we deny appellant's request that the forfeiture order be vacated on this score. C. Extent of the Forfeiture. C. Extent of the Forfeiture. ________________________ Appellant maintains that the "proceeds" subject to RICO forfeiture should not include all the funds laundered by his organization, but only the organization's profit. He does not dwell on this thesis, instead electing to incorporate the codefendants' argument to this effect. We, too, prefer not to linger. The district court treated this contention at length, 64 and we find ourselves in substantial agreement with the reasoning explicated in that court's opinion. See Saccoccia, 823 F. Supp. ___ _________ at 1001-03. VI. SENTENCING VI. SENTENCING Without objection, the district court predicated its sentencing calculations on the November 1, 1992 edition of the federal sentencing guidelines.26 See United States v. ___ _______________ Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990) ("Barring any __________ ex post facto problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing."). The court compiled appellant's criminal history score and placed him in category II. Turning to the other side of the grid, the court started with the money laundering guideline. Since appellant had been convicted under 18 U.S.C. 1956(a)(2)(A), he had a base offense level (BOL) of 23. See U.S.S.G. 2S1.1(a)(1). The court ___ then added 13 levels because the value of the laundered funds exceeded $100,000,000, see id. 2S1.1(b)(2)(N), and three levels ___ ___ premised on a finding that appellant knew (or believed) that the funds were derived from narcotics sales, see id. 2S1.1(b)(1). ___ ___ Finding appellant to be the organizer and leader of the money laundering enterprise, the court escalated four levels pursuant to U.S.S.G. 3B1.1(a). Finally, citing appellant's unsuccessful attempt to use his medical history as a device for extracting a  ____________________ 26In large part, the district judge adopted the calculations recommended by the probation department. We concentrate on how the court arrived at the guideline sentencing range (GSR), and do not differentiate between the judge's original thinking and his acceptance of the probation department's ideas. 65 continuance, see supra note 2, and stressing that the feigned ___ _____ illness occurred shortly after the court had denied appellant's request for postponement of the trial on other grounds, Judge Torres went up two levels for obstructing justice. See U.S.S.G. ___ 3C1.1. These calculations yielded an adjusted offense level of 45 for the money laundering counts. The court then turned to the RICO conspiracy count. Inasmuch as the applicable guideline, id. 2E1.1, prescribes the ___ use of an offense level equal to the greater of 19 or the adjusted offense level for the underlying conduct (here, money laundering), appellant's adjusted offense level remained unchanged. The court took a similar look at the Travel Act counts with a similar result (the applicable guideline, U.S.S.G. 2E1.2, directs the use of an offense level equal to the greater of 6 or the adjusted offense level for the underlying conduct). At the bottom line, then, the counts of conviction produced a total offense level (TOL) of 45. See id. 3D1.2(d), 3D1.3(b). ___ ___ A TOL of 43 or higher requires the imposition of a sentence of life imprisonment regardless of the offender's criminal history category.27 See U.S.S.G. Ch.5, Pt.A ___  ____________________ 27The Sentencing Commission recently submitted to Congress proposed guideline amendments that apparently would reduce the sentence mandated for conduct of the kind at issue here. See 60 ___ Fed. Reg. 25,074, 25,085-86 (1995). The proposed changes will become effective on November 1, 1995, absent congressional action to the contrary. See 28 U.S.C. 994(p) (1988). The Commission ___ has not yet decided whether the changes, if they become law, should apply retrospectively. See 60 Fed. Reg. at 25,074. If ___ the amendments are eventually determined to warrant retroactive application, appellant may then be in a position to seek appropriate relief in the district court. See United States v. ___ ______________ 66 (Sentencing Table). However, the offenses of conviction in this case all carry maximum sentences less than life. When, as in this instance, the maximum sentence for each offense of conviction is lower than the minimum punishment mandated by the applicable GSR, the guidelines require imposition of consecutive sentences "to the extent necessary to produce a combined sentence equal to the total punishment." Id. 5G1.2(d). Applying this ___ principle, the district court concluded that sentences on the several counts of conviction should run consecutively to the extent necessary to effectuate a life sentence. Because the sentencing guidelines prescribe life in prison for persons who, like appellant, sport a TOL of 43 or higher, whereas all the counts of convictions have statutory maxima that are expressed in terms of a finite number of years, the court imposed the longest possible sentence on each count and ran the sentences consecutive to one another. The result: an incarcerative sentence of 660 years.28 Appellant assails this sentence on manifold grounds. His principal lines of attack are that mandatory life sentences  ____________________ Connell, 960 F.2d 191, 197 n.10 (1st Cir. 1992); United States v. _______ _____________ Miller, 903 F.2d 341, 349 (5th Cir. 1990). We express no opinion ______ on the subject, but merely note the possibility and proceed without further reference to what the future may bring. 28The district court imposed this type of sentence rather than attempting to estimate the length of appellant's life and then fashioning a sentence of corresponding duration. We find no fault with this approach. Despite the superficial severity of a 660-year sentence, it is neither more nor less than the functional equivalent of life without parole. We treat the sentence in this light in evaluating its correctness under the guidelines and its harshness for Eighth Amendment purposes. 67 under the guidelines are illegal; that the district court misconceived its authority in imposing sentence; that the court violated the Ex Post Facto Clause; and that the court erred in making an upward adjustment for obstruction of justice. A. The Mandatory Life Sentence. A. The Mandatory Life Sentence. ___________________________ Appellant contends that the imposition of a mandatory life sentence is illegal both because Congress disavowed consecutive sentences and because, in all events, a life sentence in the circumstances of this case insults the Eighth Amendment's proscription against cruel and unusual punishment. Neither of these contentions is convincing. 1. Congressional Intent. It is apodictic that the 1. Congressional Intent. ____________________ sentencing guidelines cannot sweep more broadly than Congress' grant of power to the Sentencing Commission permits. See United ___ ______ States v. Cooper, 962 F.2d 339, 342 (4th Cir. 1992). Thus, if a ______ ______ guideline conflicts with a statute, the latter prevails. See ___ Stinson v. United States, 113 S. Ct. 1913, 1918-19 (1993); United _______ _____________ ______ States v. Fiore, 983 F.2d 1, 2 (1st Cir. 1992), cert. denied, 113 ______ _____ _____ ______ S. Ct. 1830 (1993). Appellant perceives such a collision here. In his view, Congress mandated a strong statutory preference for concurrent sentences, and the Sentencing Commission's instruction that fixed-year sentences should be imposed consecutively to effectuate life imprisonment, see U.S.S.G. 5G1.2(d), must yield ___ the right of way to Congress' expressed preference. Appellant hinges this conclusion on Congress' enactment of two statutory provisions, namely, 28 U.S.C. 994(l)(2) & 68 994(v) (1988). We think he reads the cited statutes with much too sanguine an eye. Neither statute prohibits the imposition of consecutive sentences. Rather, section 994(l)(2) merely declares the "general inappropriateness" of consecutive sentences for a conspiracy and its object offense, and section 994(v) merely directs the Commission to "limit[] consecutive terms of imprisonment" for convictions on related general and specific offenses.29 While these statutes arguably imply a general _______ congressional preference for concurrent sentences, they do not, as appellant intimates, outlaw consecutive sentences. On the contrary, the statutory scheme leaves ample room for courts, following the lead of the Sentencing Commission, to deploy consecutive sentences in appropriate circumstances. Two observations show the virtual inevitability of this conclusion. In the first place, U.S.S.G. 5G1.2 became effective only with the consent of Congress. We consider this to be powerful evidence that Congress itself saw no inconsistency between the guideline provision and the statutory scheme. See ___ United States v. Luedecke, 908 F.2d 230, 233 (7th Cir. 1990). In _____________ ________ the second place, Congress minced no words in ceding the Commission discretion to determine what particular circumstances  ____________________ 29To the extent appellant's argument is based on a claimed congressional preference for concurrent sentences in connection with conspiracy and its object offenses, and in connection with general and specific offenses, the 36 consecutive ten-year sentences imposed for separate violations of 18 U.S.C. 1957 are unaffected. These sentences total 360 years. Barring a lifespan of biblical proportions, appellant's time on this mortal coil will not exceed so lengthy an interval. 69 would trigger the need for consecutive sentences. See 18 U.S.C. ___ 3584(a) (1988) (providing in part that "if multiple terms of imprisonment are imposed on a defendant at the same time . . . the terms may run concurrently or consecutively"); see also ___ ____ United States v. Flowers, 995 F.2d 315, 316-17 (1st Cir. 1993) ______________ _______ (holding that section 3584(a) authorizes the Sentencing Commission "to write guidelines that say when, and to what extent, [incarcerative] terms should be concurrent or consecutive"). We will not flog a dead horse. Because Congress gave the Sentencing Commission expansive authority to promulgate guidelines specifying when sentences should be consecutive or concurrent, and then directed sentencing courts to refer to the guidelines in order to determine whether "multiple sentences to terms of imprisonment should be ordered to run concurrently or consecutively," 28 U.S.C. 994(a)(1)(D), the court below possessed the power indeed, the responsibility to impose a series of consecutive sentences effectuating the clearly expressed command of U.S.S.G. 5G1.2. 2. The Eighth Amendment. Appellant bemoans his 2. The Eighth Amendment. ______________________ sentence as mocking the Eighth Amendment's proscription against cruel and unusual punishments. This ululation is more cry than wool. In Solem v. Helm, 463 U.S. 277 (1983), the Supreme _____ ____ Court held that "as a matter of principle . . . a criminal sentence must be proportionate to the crime for which the 70 defendant has been convicted." Id. at 290. This opinion did not ___ usher in a regime of strict proportionality review applicable to all criminal sentences, for the Court restricted its holding to penalties that are "grossly" or "significantly" disproportionate to the underlying criminal activity. Id. at 288, 303. The Court ___ did not in any way, shape, or form, then or thereafter, suggest that the Eighth Amendment requires a precise calibration of crime and punishment in noncapital cases. Solem looms as the high water mark of the _____ proportionality approach. In the pre-Solem era, the Court _____ consistently recognized the legislature's primacy in determining the appropriate punishment for criminal behavior, see e.g., ___ ____ Rummel v. Estelle, 445 U.S. 263, 274 (1980); Hutto v. Davis, 454 ______ _______ _____ _____ U.S. 370, 374 (1982) (per curiam), and the Court has sounded much the same note in the post-Solem era, see, e.g., Harmelin v. _____ ___ ____ ________ Michigan, 501 U.S. 957, 962 (1991) (opinion of Scalia, J.) ________ (expressing the view that the length of the sentence actually imposed in respect to a felony conviction is entirely a matter of legislative prerogative); id. at 998-99 (opinion of Kennedy, J.) ___ (similar; listing cases). Throughout, the Justices have made it quite clear that strict judicial scrutiny of statutorily mandated penalties in noncapital cases is not to be countenanced. See, ___ e.g., Gore v. United States, 357 U.S. 386, 393 (1958). The ____ ____ _____________ Constitution does not require legislatures to balance crimes and punishments according to any single standard, or to achieve perfect equipoise. Indeed, the Solem Court itself acknowledged _____ 71 the need for judges to "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishment for crimes." Solem, 463 U.S. _____ at 290. The Court also has sounded two cautionary notes. First, "[t]he inherent nature of our federal system" necessarily produces "a wide range of constitutional sentences." Id. at 291 ___ n.17; see also Rummel, 445 U.S. at 282. Second, "Eighth ___ ____ ______ Amendment judgments should not be, or appear to be, merely the subjective views of individual [judges]; judgment should be informed by objective factors to the maximum possible extent." Coker v. Georgia, 433 U.S. 584, 592 (1977); accord Solem, 463 _____ _______ ______ _____ U.S. at 290. For these reasons, "a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." Id. at 290 ___ n.16. The Justices' most recent pronouncements fully support the conclusion that serious crimes may result in the imposition of sentences as severe as life imprisonment without working any constitutional insult. In Solem, the Court explicitly contrasted _____ the defendant's "relatively minor" offenses, id. at 296-97, with ___ "very serious offenses" such as drug trafficking, id. at 299, and ___ suggested that statutes providing for life imprisonment might be applied constitutionally to inveterate drug dealers or other violent criminals, id. at 299 n.26. ___ Harmelin, fairly read, emits an even clearer signal. ________ 72 There, the Court considered the application of the constitutional prohibition against cruel and unusual punishment to a mandatory sentence of life imprisonment without parole imposed in a narcotics case against a defendant who possessed more than 650 grams of cocaine. See Harmelin, 501 U.S. at 961. Justice ___ ________ Scalia, in an opinion joined on this point by the Chief Justice, rejected the extended proportionality analysis developed in Solem _____ and declared that nothing in the Eighth Amendment guarantees proportionate sentences. See id. at 965. He concluded that ___ ___ "Solem was simply wrong," id., because the Eighth Amendment _____ ___ provided protection with respect to modes and methods of punishment, not the length of incarceration, see id. at 966-67. ___ ___ Justice Kennedy, joined by Justices O'Connor and Souter, wrote a concurring opinion that, when combined with Justice Scalia's opinion, aggregated the five votes necessary to uphold Harmelin's sentence. Justice Kennedy thought that stare decisis counseled _____ _______ adherence to a "narrow proportionality principle," id. at 996, ___ one that recognizes that the "Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are `grossly disproportionate' to the crime," id. at 1001 (quoting Solem). ___ _____ After noting the grave harm to society wreaked by illegal drugs, Justice Kennedy found nothing "grossly disproportionate" in either the length nor the mandatory nature of Harmelin's sentence. See id. at 1001-08. ___ ___ A dispassionate application of Harmelin to this case ________ 73 defeats appellant's attack on the constitutionality of his sentence. Although the Justices in Harmelin disagreed on the ________ status of proportionality review under the Eighth Amendment, a majority found insufficient disproportionality to forestall a mandatory sentence of life without parole for possession of over 650 grams of cocaine. With this as a reference point, appellant's sentence can hardly be deemed "grossly disproportionate" to the underlying conduct conduct which, by all accounts, significantly facilitated narcotics trafficking on a Brobdingnagian scale.30 To say more would be supererogatory. We know that Harmelin is not an aberration; in Hutto, another case that ________ _____ teaches much the same lesson, the Court upheld, against a proportionality attack, a sentence of 40 years in prison for possessing nine ounces of marijuana with the intent to distribute it. 454 U.S. at 374. We also know that Congress not the judiciary is vested with the authority to define, and attempt to solve, the societal problems created by drug trafficking across national and state borders. The Supreme Court has made it plain that the use of severe penalties as part of the legislative armamentarium does not constitute cruel and unusual punishment.  ____________________ 30Appellant's reliance on United States v. Heath, 840 F. _____________ _____ Supp. 129 (S.D. Fla. 1993), is misplaced. In Heath, the district _____ court, after expressing concern over the proscription against cruel and unusual punishment, declined to impose a life sentence as directed by the guidelines, and instead departed downward by extrapolating from the sentencing table. See id. at 130-32. We ___ ___ deal with appellant's claim that the court below should have departed downward in Part VI(B), infra. _____ 74 See, e.g., Harmelin, supra; Hutto, supra; see also United States ___ ____ ________ _____ _____ _____ ___ ____ ______________ v. Munoz, 36 F.3d 1229, 1239 (1st Cir. 1994), cert. denied, 115 _____ _____ ______ S. Ct. 1164 (1995). Under this light, the flimsiness of appellant's Eighth Amendment challenge becomes apparent. B. The Refusal to Depart. B. The Refusal to Depart. _____________________ As a general rule, "a district court's refusal to depart, regardless of the suggested direction, is not appealable." United States v. Romolo, 937 F.2d 20, 22 (1st Cir. _____________ ______ 1991). There is, of course, an exception that applies "if the record supports an inference that the sentencing court's failure to depart did not represent an exercise of factfinding or discretion, but was instead the product of a court's miscalculation about whether it possessed the authority to depart." United States v. Amparo, 961 F.2d 288, 292 (1st Cir.), _____________ ______ cert. denied, 113 S. Ct. 224 (1992); accord United States v. _____ ______ ______ ______________ Pierro, 32 F.3d 611, 618-19 (1st Cir. 1994), cert. denied, 115 S. ______ _____ ______ Ct. 919 (1995). Appellant attempts to wedge his case within the dimensions of this exception on the ground that the sentencing court believed, erroneously, that it lacked discretion to impose concurrent sentences. This claim misconstrues the record. In United States v. Quinones, 26 F.3d 213 (1st Cir. ______________ ________ 1994), we held that a court may deviate from U.S.S.G. 5G1.2 "if, and to the extent that, circumstances exist that warrant a departure." Id. at 216. Although Quinones had not yet been ___ ________ decided when Judge Torres sentenced Saccoccia, we are satisfied that he understood this principle and anticipated our holding. 75 At the disposition hearing, appellant argued that the district court had authority under 18 U.S.C. 3584(a) to depart downward and impose concurrent sentences on all counts notwithstanding the terms of U.S.S.G. 5G1.2. The court acknowledged that it possessed such authority, but it concluded (appropriately, we think) that because the guidelines required consecutive sentences in appellant's case, it could only impose concurrent sentences if the case satisfied the conditions for a downward departure, that is, if it found mitigating circumstances not considered by the Sentencing Commission. See U.S.S.G. ___ 5K2.0. Discerning no such mitigation, the court eschewed a downward departure. In other words, the court realized that it could impose concurrent sentences as a specie of downward departure, cf. Quinones, 26 F.3d at 216 (authorizing the ___ ________ imposition of consecutive sentences as a specie of upward departure), but it chose not to do so because, in its judgment, the facts did not warrant a downward departure. This ends our jaunt. Inasmuch as the district court correctly understood that it possessed the power to depart from the GSR but made a discretionary decision to refrain from exercising that power, we lack jurisdiction to address appellant's claim. See Pierro, 32 F.3d at 619 (explaining that a ___ ______ discretionary refusal to depart by a judge who recognizes his power, but who says, in effect, that the case before him is not "sufficiently unusual to warrant departing," is not reviewable on appeal). 76 C. Ex Post Facto Concerns. C. Ex Post Facto Concerns. ______________________ Appellant seeks to incorporate an argument advanced on appeal by his codefendants to the effect that the district court's sentencing determinations abridged the Ex Post Facto Clause, U.S. Const. art. I, 9, cl. 3. In appellant's view, the court's error lay in increasing his TOL based on an amendment to the money laundering guideline, U.S.S.G. 2S1.1(b)(1),31 that did not become effective until November 1, 1991 during the lifespan of the conspiracy, but subsequent to the last proven instance of money laundering. This criticism fails for at least three reasons. First, appellant did not broach the topic at sentencing. He has, therefore, waived it. See United States v. ___ _____________ Dietz, 950 F.2d 50, 55 (1st Cir. 1991) (explaining that "in _____ connection with sentencing as in other contexts, . . . arguments not seasonably addressed to the trial court may not be raised for the first time in an appellate venue"); accord, e.g., United ______ ____ ______ States v. Piper, 35 F.3d 611, 620 n.6 (1st Cir. 1994), cert. ______ _____ _____ denied, 115 S. Ct. 1118 (1995); Sepulveda, 15 F.3d at 1202. ______ _________ Second, appellant was not only the mastermind of the money laundering ring, but also its chief executive officer,  ____________________ 31The amendment inserted the words "or believed" into section 2S1.1(b)(1), see U.S.S.G. App. C, Amend. No. 378 (1992), ___ with the result that the guideline, subsequent thereto, read in pertinent part: "If the defendant knew or believed that the ___________ funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances, increased [his BOL] by 3 levels." (Emphasis supplied to show added language). 77 comptroller, sales manager, and director of operations. The weight of the evidence heavily preponderates in favor of a finding that appellant knew and believed of the money's origins. ___ Indeed, appellant wholly fails to demonstrate how and where the district court erred in determining his level of "knowledge or belief," or why the guideline revision makes any real difference in his case. This failure typical of litigants who attempt to ___________ incorporate by reference arguments which, if made in earnest, deserve individualized attention is fatal to appellant's cause. See, e.g., Zannino, 895 F.2d at 17 ("[I]ssues adverted to in a ___ ____ _______ perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Third, even if appellant were somehow to surmount the two hurdles we have just described, he could prevail only upon a showing of plain error. See United States v. Olano, 113 S. Ct. ___ _____________ _____ 1770, 1776-78 (1993); United States v. Olivier-Diaz, 13 F.3d 1, ______________ ____________ 5-6 (1st Cir. 1993). Given the strict requirements that attend amelioration under the plain error doctrine, and the substantial discretion invested in appellate courts with regard to the doctrine's use, see generally Taylor, ___ F.3d at ___ [slip op. ___ _________ ______ at 6-7], plain error is plainly absent here. Put bluntly, we detect nothing in appellant's belated assault that causes us to question "the fundamental fairness or basic integrity of the proceeding below in [any] major respect." Id. at ___ [slip op. ___ at 7]. D. Obstruction of Justice. D. Obstruction of Justice. ______________________ 78 Appellant's fourth line of attack suggests that the sentencing court erred in elevating his offense level for obstruction of justice. This sortie is moot. The only practical effect of the adjustment is to raise the TOL from 43 to 45. Since life imprisonment is mandatory at or above TOL 43, see __ __ _____ ___ U.S.S.G. 5G1.2; see also U.S.S.G. 5A, comment. (n.2) ("An ___ ____ offense level of more than 43 is to be treated as an offense level of 43."), canceling the enhancement would accomplish nothing. It is this court's settled practice not to address an allegedly erroneous sentencing computation if, and to the extent that, correcting it will neither change the defendant's sentence nor relieve him from some unfair collateral consequence. See, ___ e.g., Sepulveda, 15 F.3d at 1199; United States v. Bradley, 917 ____ _________ _____________ _______ F.2d 601, 604 (1st Cir. 1990). We believe that this philosophy is fully applicable in a situation where, as here, correction of an allegedly erroneous finding would not eliminate the certainty of a mandatory sentence of life imprisonment. Courts should not tilt at windmills. VII. CONCLUSION VII. CONCLUSION We need go no further. Having scoured the record and carefully considered appellant's entire asseverational array (including some arguments not specifically discussed herein), we detect no reversible error. As we see it, appellant was lawfully extradited, fairly tried, justly convicted, and appropriately punished. 79 Affirmed. Affirmed. ________ 80